RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

WENDY BROWNING, Mother and Next Friend of C.S., a
minor; DARRELL SMITH, as Guardian of M.S., a minor,
                                    *Plaintiffs-Appellees*,

            *v.*

EDMONSON COUNTY, KENTUCKY, et al.,
                                    *Defendants*,

SHANE DOYLE; JORDAN JONES,
                                    *Defendants-Appellants*.

⎫
⎪
⎪
⎪
⎬   No. 20-6078
⎪
⎪
⎪
⎭

─────────────

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:18-cv-00057—Gregory N. Stivers, District Judge.

Argued: July 28, 2021

Decided and Filed: November 17, 2021

Before: COLE, ROGERS, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Aaron D. Smith, ENGLISH, LUCAS, PRIEST & OWSLEY, LLP, Bowling Green, Kentucky, for Appellants. Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, for Appellees. **ON BRIEF:** Aaron D. Smith, Jessica R. Shoulders, ENGLISH, LUCAS, PRIEST & OWSLEY, LLP, Bowling Green, Kentucky, for Appellants. Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, for Appellees.

ROGERS, J., delivered the opinion of the court in which COLE, J., joined, and MURPHY, J., joined in part. MURPHY, J. (pp. 25–33), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  This case arises from a high-speed police pursuit by Edmonson County, Kentucky, sheriffs that ended in a collision between the fleeing car and another vehicle. Two minor passengers in the fleeing vehicle, C.S. and M.S., were injured, and one of them, C.S., although unconscious in the backseat, was subsequently tased by defendant Deputy Sheriff Jordan Jones when C.S. did not respond to instructions from Jones.  The two minors brought this suit against Edmonson County and several police officers for the injuries they sustained, asserting a variety of constitutional and state law claims.  The district court dismissed most of the claims, but denied summary judgment on an excessive force claim against defendant Jones pursuant to 42 U.S.C. § 1983, and on several state-law claims asserted against defendants Jones and Sheriff Shane Doyle.  In this interlocutory appeal, Jones and Doyle argue that the district court erred in ruling that they were not entitled to qualified immunity on these remaining claims. Defendants also contend that summary judgment should have issued on the pendent state claims because there was no genuine dispute of material fact as to those claims.  On the facts as we must take them on this interlocutory appeal, the district court properly ruled that Jones is not entitled to qualified immunity on the § 1983 and state-law battery claims.  However, the defendants are entitled to qualified immunity under Kentucky law on the state-law negligence and gross negligence claims.  Finally, on this interlocutory appeal we lack jurisdiction to address the defendant's arguments for dismissal of the remaining state-law claims.

**I.**

At approximately 9:30 p.m. on February 27, 2018, special deputy Austin Meredith of the Edmonson County Sheriff's Office ("ECSO") attempted to initiate a traffic stop on an automobile for an unilluminated license plate and the failure of a passenger to wear a seatbelt. The automobile was being driven by Brandon Embry, with plaintiffs M.S. and C.S., who were minors, sitting as passengers in Embry's vehicle.  After following a short distance, Meredith activated his police cruiser lights and attempted to stop Embry's vehicle, but Embry immediately accelerated and attempted to flee.  Meredith accelerated to follow and was soon joined in the

pursuit by defendant Jones, an ECSO Deputy Sheriff, whose police cruiser was capable of going much faster than Meredith's vehicle. Jones took over the pursuit, which lasted approximately 12 minutes over an 18-mile stretch of highway, with the vehicles reaching speeds of almost 130 miles-per-hour.

During the pursuit, Jones learned that the initiating offense was an unilluminated license plate, that there were multiple passengers in the vehicle, and that at least one passenger was believed to be unbelted. Jones observed Embry's vehicle fishtail on S-curves in the road, and at another time, he saw the vehicle almost lose control and crash after doing a 360-degree rotation before it steadied and continued south on the highway toward Bowling Green, Kentucky. Jones and Meredith observed objects being thrown out of the car but could not identify what they were aside from a single "grocery bag sack." Approximately two minutes before the pursuit ended, another officer radioed that he had found ammunition in the area where objects had been thrown from the vehicle. Jones testified that if the vehicle had reached Bowling Green, he would have stopped the pursuit. Before that could happen, Embry's vehicle made an abrupt turn at an intersection and severely crashed into a third party's vehicle in a T-bone impact.

The immediately following events are set forth in greater detail below. In short, Jones tased passenger C.S. after C.S. failed to respond to Jones's order to show his hands.

M.S. had to be mechanically extracted from the front passenger seat of the vehicle, and M.S. and C.S. were both flown by helicopter to a hospital to receive treatment for their injuries.

Doyle, the Sheriff of Edmonson County, was not involved in the pursuit. Doyle first learned of the events after receiving a call from the ECSO dispatch center, which informed him that Meredith and Jones were in pursuit of a vehicle and that they both wanted Doyle to be notified. Doyle struggled to monitor the pursuit by radio before receiving an update by phone from another volunteer deputy riding alongside Meredith. Once Doyle heard that there had been a collision in Bowling Green, he left to go to the scene of the accident. He arrived at the scene a few minutes after the collision occurred. Doyle did not seek to find out what the initiating offense was, did not attempt to communicate directly with Jones or Meredith during the pursuit, and did not direct that the pursuit be altered or terminated in any way while it was ongoing.

The ECSO maintains a Policy and Procedure ("P&P") Manual, written by Doyle, which contains a chapter discussing pursuits. The Manual contains factors and policies officers should consider in deciding whether to initiate or end a pursuit. Doyle testified that when someone new joins the ECSO, Doyle sits down with the new person and reviews each page of the Manual, including the section on pursuit and emergency driving. According to Doyle, he had gone over the pursuit policy with both Meredith and Jones at separate times.

Plaintiffs filed this action against defendants Edmonson County, Jones, Meredith, and Doyle, alleging liability for injuries sustained by M.S. and C.S. due to the pursuit. Plaintiffs asserted 42 U.S.C. § 1983 claims for violations of the Fourth and Fourteenth Amendments against all defendants, state-law negligence and gross negligence claims against all defendants, and state-law assault and battery claims against Meredith and Jones. All defendants moved for summary judgment. The district court granted the motions in part and denied them in part. In relevant part, the district court denied Jones's motion for summary judgment on C.S.'s § 1983 and state-law battery claims, and denied both Jones's and Doyle's motions for summary judgment on plaintiffs' state-law negligence and gross negligence claims, ruling that they were not entitled to qualified immunity with respect to any of the aforementioned claims. Jones and Doyle timely filed this interlocutory appeal challenging the district court's determinations.

**II.**

First, Jones appeals from the district court's denial of his motion for summary judgment on C.S.'s § 1983 claim against Jones, which alleges that Jones violated C.S.'s constitutional rights under the Fourth Amendment by using excessive force to restrain C.S. while he was unconscious in the backseat of Embry's vehicle. We have jurisdiction to review this interlocutory appeal on the issue of qualified immunity, but our review is limited to the facts that a jury could find in the plaintiffs' favor, as determined expressly or implicitly by the district court. Based on these factual determinations, the district court properly ruled that Jones was not entitled to qualified immunity on the excessive-force claim.

## A.

Although a denial of summary judgment is ordinarily not reviewable because it is not a final judgment, the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "This is so because qualified immunity—which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights—is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (internal quotation marks and citations omitted). A denial of this entitlement would "prove 'effectively unreviewable on appeal from a final judgment'" after trial. *Id.* (quoting *Mitchell*, 472 U.S. at 527–28). At this interlocutory stage, our review of the denial of qualified immunity is limited to the appeal "challenging the district court's legal determination that the defendant's actions violated a constitutional right or that the right was clearly established." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015).

Under *Johnson v. Jones*, 515 U.S. 304 (1995), "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319–20. Thus, any arguments on appeal challenging the district court's determination as to "which facts a party may, or may not, be able to prove at trial," are not reviewable. *Id.* at 313. Similarly, "a defendant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal." *DiLuzio*, 796 F.3d at 609 (citing *Romo v. Largen*, 723 F.3d 670, 673–74 (6th Cir. 2013). To be sure, defendants may still present legal challenges to a district court's factual determination, such as by arguing that the court's determination was "blatantly contradicted by the record, so that no reasonable jury could believe it," for instance by means of a videotape. *Scott v. Harris*, 550 U.S. 372, 380 (2007). There is no such objectively compelling evidence in this case. If the defendant's challenge mixes both legal and factual challenges, we "ignore the defendant's attempts to dispute the facts and nonetheless

resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005).

Consequently, in deciding this appeal, we must defer to the factual determinations made by the district court, but may also consider other uncontroverted evidence in the record. *DiLuzio*, 796 F.3d at 610–11. In accepting the district court's factual determinations, we do not make any findings of fact ourselves. *Id.* However, where the district court has not expressly cited the facts or evidence it relied on in denying summary judgment, we review the record and determine what facts the district court "likely assumed." *Id.* at 611 (quoting *Johnson*, 515 U.S. at 319).

**B.**

Using this standard, the facts related to Jones's tasing of C.S. are as follows. First, we restate the facts explicitly set out by the district court:

> After the collision, Jones exited his vehicle, pulled his gun out, pointed the gun at Embry, and ordered him to get out. (Jones Dep. 45:6-46:11). As Embry exited the vehicle, Jones punched him in the forehead, apparently to stop him from fleeing. (Jones Dep. 47:3-13). Jones then turned his attention to C.S. and ordered C.S. to show his hands multiple times without receiving a response. (Jones Dep. 51:21-52:3, 52:14-17). According to Jones, he then tased C.S. because of information Jones received about ammunition being in the car and C.S. not showing his hands after multiple orders to do so. (Jones Dep. 53:23-54:3). C.S. does not remember anything after the crash because he believes he lost consciousness and did not regain consciousness until he was lying face down on the ground handcuffed. (C.S. Dep. 32:23-34:2).
>
> . . . .
>
> During the pursuit, Jones was told ammunition had been thrown out of the vehicle. (Jones Dep. 18:7-22). The pursuit ended when the car in which C.S. was riding was smashed on the passenger side by a third party's vehicle. (Jones Dep. 21:21-22:6; Pls.' Resp. Defs.' Mots. Summ. J. Ex. 11, DN 66-11). According to Jones:
>
>> Once I got [the driver] on the ground and cuffed, I then moved to the rear of the vehicle where I could see someone else. I could see an individual slumped over kind of rocking back-and-forth, give them multiple commands to show me their hands with no comp – or they didn't comply at all. I then pulled out my baton and broke the window because I couldn't get the door open, put my baton back up. The individual still would not show me their hands and was still rocking back-and-forth hiding their hands. Due to

> [officers] telling me that there's ammunition, I – I figured that there could have been a weapon of some sort inside the vehicle that they were trying to conceal from me. It's at that time I activated my taser and gave the commands again and no comply. I deployed the taser into the back region of this male.

(Jones Dep. 25:8-23). Jones also testified that his observation of C.S. "rocking back-and-forth" could have been due to the car itself rocking back and forth as the car was coming to a rest. (Jones Dep. 56:4-16).

*Browning ex rel. C.S. v. Edmonson County*, No. 1:18-CV-00057-GNS-HBB, 2020 WL 4718763, at *1, *4 (W.D. Ky. Aug. 13, 2020).

In rejecting Jones's argument that he had used force because of noncompliance, the district court clearly assumed that a jury could find that there was no sign of verbal hostility or physical resistance on the part of C.S., that Jones may have merely had a suspicion that C.S. was armed, and—importantly—that "Jones himself did not attribute C.S.'s [moving back and forth] as verbal hostility or physical resistance." *Id.* at *4. The district court further took into account the uncontested fact that C.S. was found slumped over in the backseat following the collision. *Id.*

To prevail on the excessive-force claim, C.S. must show that Jones's use of the taser amounted to a violation of C.S.'s clearly established constitutional rights. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Based on the facts articulated above, a reasonable jury could find that C.S. made such a showing here.

Certainly by 2018 when Jones tased C.S., it was clearly established in this circuit that an individual has a constitutional right not to be tased when he or she is not actively resisting. Jones violated this right by tasing an unconscious C.S., who, after experiencing a major automobile collision as a backseat passenger, was not visibly engaged in active resistance. Consequently, the denial of qualified immunity was proper here.

Put differently, the district court denied qualified immunity on the facts that, following a collision resulting from a dangerous car chase, the defendant officer tased a passenger of the vehicle who did not respond to the officer's instruction to show his hands, where the passenger showed no signs that he was even conscious beyond rocking back and forth, a movement that

may have been attributable to rocking of the car and was not interpreted as hostility or active resistance.  It is clearly established that such a preemptive tasing is an objectively unreasonable use of force.

Nine years ago, in *Cockrell v. City of Cincinnati*, we summarized the cases holding that tasing is excessive force against a plaintiff who had done nothing to resist arrest, or is already detained.  In such cases:

> a § 1983 excessive-force claim is available, since "the right to be free from physical force when one is not resisting the police is a clearly established right." *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010) (quoting *Wysong v. City of Heath*, 260 F. Appx 848, 856 (6th Cir. 2008)); see also *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) (holding that tasing non-violent passenger during traffic stop for failure to hang up from 911 call violated clearly established law, as of October 2005); *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008) (holding that repeated use of taser against subdued defendant lying face-down in swamp water violated clearly established law, as of November 2004); [*Casey v. City of Federal Heights*, 509 F.3d 1278, 1278 (10th Cir. 2007)] (holding that officers' tasing compliant, non-violent misdemeanant violated clearly established law, as of August 2003); *Shekleton v. Eichenberger*, No. C10–2051, 2011 WL 1578421 (N.D. Iowa Apr. 26, 2011) (holding that tasing non-violent misdemeanant, who did not resist arrest, struggle with, or pose a threat to, officers, or attempt to flee, violated clearly established law, as of September 2008); *Borton v. City of Dothan*, 734 F. Supp. 2d 1237 (M.D. Ala. 2010) (holding that tasing mentally disturbed patient who was not under arrest three times, even though she was secured to a gurney with handcuffs and restraints, was violation of clearly established law, as of August 2006); [*Orsak v. Metro. Airports Comm. Airport Police Dept.*, 675 F. Supp. 2d 944, 944 (D. Minn. 2009)] (holding that officers who pulled cyclist from bike, stood him up, and shot him with taser may have violated clearly established law, as of September 2006); *Asten v. City of Boulder*, 652 F. Supp. 2d 1188 (D. Colo. 2009) (holding that "the unforewarned tasing of a mentally unstable woman [who was not under arrest] in her own home" violated clearly established law, as of October 2006).

468 F. App'x 491, 496 (6th Cir. 2012); *see also Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (first citing *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) and then citing *Kijowski*, 372 F. App'x at 601); *Thomas v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017) (quoting *Hagans*, 695 F.3d at 509).

Accordingly, C.S. had a clearly established constitutional right not be tased where he showed no resistance other than a passive failure to respond to an order to show his hands, and where an obvious reason not to respond was the shock of the collision.

Moreover, the clearly established general factors for determining whether an officer's use of force is excessive all support that tasing C.S. was excessive on the facts as we accept them on this appeal. Those factors are set out in *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The first *Graham* factor—the severity of the crime—does not justify the type and degree of force that Jones used here. The only crime that C.S. committed was failing to wear his seatbelt. That by itself is a minor traffic violation that does not warrant the use of a taser. *See* Ky. Rev. Stat. § 189.125(6). Nor does the fact that there was a police pursuit independently warrant the use of force, despite the seriousness of the offense, because C.S. was a passenger sitting in the backseat and is not responsible for the driver's crimes. *See Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012). Put differently, the severity of Embry's crime in initiating the pursuit cannot be imputed onto C.S. for the purposes of the first *Graham* factor. This factor therefore does not support Jones's tasing of C.S.

The second *Graham* factor, "whether the suspect poses an immediate threat to the safety of the officers or others," also supports C.S. on the facts of this case. 490 U.S. at 396. The jury could well find that there was no such threat. C.S. was unconscious, and while Jones may not have known that, C.S.'s unconscious state shows that he made no threatening statement, and made no movements that could be considered hostile, aggressive, or threatening. The jury could also rely on the absence of any evidence that Jones had reason to believe there was a firearm in the car. It is true that the Jones was aware that something, potentially a firearm or ammunition, was thrown from the car during the chase. But it is hard to see how that shows that there still was a firearm in the car when the chase ended. Presumably, the whole point of throwing these items away is to avoid having a firearm or ammunition in the car should the police later get the chance to search the car. Or at least the jury could so reason.

This conclusion regarding the "immediate threat" determination follows *a fortiori* from our reasoning in *Wright v. City of Euclid*, 962 F.3d 852, 867 (6th Cir. 2020), that a reasonable

jury could find under the totality of the circumstances that even though the suspect reached his hand toward the vehicle's center console during a traffic stop, a reasonable officer would not believe that the suspect posed an immediate threat to his or her safety. *Id.* We concluded that the officer was not entitled to qualified immunity for his use of the taser under those circumstances, even though the officers were making split-second determinations during the incident. *Id.* at 868–70. Similarly, based on the facts related to the severity of the collision, C.S.'s unconsciousness, and the thrown ammunition, a reasonable jury could find that under the totality of the circumstances, a reasonable officer would not believe that C.S. posed a threat of immediate danger.

The third *Graham* factor, whether C.S. was "actively resisting arrest or attempting to evade arrest by flight," also weighs against Jones on the relevant facts. 490 U.S. at 396. There was obviously no flight in this case. There was also no "active" resistance. Whatever "active" means, it has to mean something more than mere silence and inaction. To characterize such "resistance" as "active" is to deprive the word of all meaning.

This conclusion regarding active resistance is squarely supported by our decision in *Eldridge*, 533 F. App'x at 529. In *Eldridge* we held that a lethargic driver who clutched his car's steering wheel and provided unhelpful to responses to an officer's queries was not engaged in "active resistance." *Id.* at 530. The plaintiff had been driving erratically, apparently drunk, but was later determined to have been a diabetic suffering a hyperglycemic episode. *Id.* at 530–31. After a careful review of our cases, we reasoned:

> If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more. It can be a verbal showing of hostility, as was the case in *Caie* [*Caie v. W. Bloomfield Twp.*, 485 F. App'x 92 (6th Cir. 2012)]. It can also be a deliberate act of defiance using one's own body, as in *Hagans* [*Hagans*, 695 F.3d at 505], or some other mechanism, such as the [revving of the motor of a] truck in *Foos* [*Foos v. City of Delaware*, 492 F. App'x 582 (6th Cir. 2012)]. Taken in the light most favorable to Eldridge, his noncompliance was not paired with any signs of verbal hostility or physical resistance, and therefore cannot be deemed active resistance. *See also Coles v. Eagle*, 704 F.3d 624, 629–30 (9th Cir. 2012) . . . .

*Id.* at 535.

Other cases have consistently reasoned accordingly. In *Thomas*, we noted that active resistance generally means: "physical struggles with police," threats toward officers, refusal or resistance to being handcuffed, and erratic or irrational behavior. *Thomas*, 715 F. App'x at 460 (collecting cases); *see also Cockrell*, 468 F. App'x at 495.

*Eldridge* accurately states the clearly established law, and the facts that a jury could find in the case before us are not materially distinguishable. C.S. was neither verbally hostile nor physically resistant. Nor does the record reflect any point in time where C.S.'s behavior changed towards Jones such that a reasonable officer could interpret the change as an escalation of aggression towards Jones. Further, failure to exit a vehicle is not active resistance and does not justify the use of a taser. *Eldridge*, 533 F. App'x at 535 (citing *Coles*, 704 F.3d at 629–30). Unlike other cases where the use of a taser was deemed reasonable, in this case, C.S. did not make "a deliberate choice to be defiant." *Id.* at 534 (citing *Caie*, 485 F. App'x at 94).

Cases that Jones points to where the use of a taser was deemed reasonable because the suspect was actively resisting are distinguishable on the facts. For example, in *Caie*, even though the single use of a taser was deemed reasonable in that case, the court's determination rested on the fact that the suspect was intoxicated, erratic, consciously barred officers from handcuffing him, and endangered officer safety by trying to provoke them into using deadly force. 485 F. App'x at 96. C.S.'s conduct was starkly different here. In *Thomas*, the suspect who was tased was deemed to be actively resisting when he refused to comply with police orders to get on the ground after he had been fighting with another person, was shouting, and was noticeably angry. 715 F. App'x at 458–59. The suspect in *Thomas* was visibly conscious and capable of complying, but instead walked away of his own volition. *Id.* at 461. In these cases, the officers could tell that the individual was conscious and actively resisting, either by being verbally hostile towards the officers or by taking some sort of voluntary physical action in addition to their noncompliance. In contrast, C.S. made no verbal response to Jones's commands, showed no physical reaction, hostile or otherwise, to any of Jones's commands, and had to have been so perceived because he was incapable of any volitional act throughout the entire incident.

It is true that in three cases we have held that a use of force following a car chase was not excessive, but these cases are materially different. A common distinction among these cases is that they involved using force on the driver, who had *already* engaged in highly dangerous evasive driving, while C.S. was a passenger in the backseat whose worst apparent criminal activity was not wearing a seatbelt.

In two of the three cases, moreover, the intentional use of force was considerably less than employment of a taser. In *Tallman v. Elizabethtown Police Department*, following a high-speed chase, the driver got out and immediately began to flee. 167 F. App'x 459, 461 (6th Cir. 2006). Within a matter of only a few seconds, the pursuing officer stopped, approached the stopped vehicle with his gun drawn, commanded the front seat passenger to show his hands, and then reached through the window with one arm while still holding his gun pointed at the passenger. *Id.* The gun accidentally discharged, killing the passenger, and simultaneously seriously injuring the officer. *Id.* A number of factors not present here rendered it reasonable for the officer to point his gun, *see id.* at 466–67, but the biggest distinction is that the only intentional use of force was to point the gun. In *Dunn v. Matatall*, we held that officers' use of force was objectively reasonable when they physically removed the suspect from his vehicle, injuring him in the process, after he led police on a two-minute car chase through a residential neighborhood. 549 F.3d 348, 350 (6th Cir. 2008). Again, in addition to factual distinctions regarding the dangerousness of the driver, the force used was not the intentional employment of a firearm or taser. *See id.* at 351, 354. Instead, it was only the physical removal of the driver from the vehicle in that case.

In the third case, we held that officers did not use excessive force when they simply grabbed a driver's arm and hauled him out of the vehicle after he led them in a high-speed pursuit. *See Williams v. Ingham*, 373 F. App'x 542, 547–48 (6th Cir. 2010). In a subsequent arrest of the same suspect after another high-speed chase, we ruled that the officers used reasonable force when they deployed a taser only after other efforts to subdue the suspect failed. *Id.* at 548. Before use of the taser, the driver not only disregarded verbal commands to exit the vehicle, but he also moved toward the center of the front seat and reached toward the console. When the officer used a takedown technique to remove the driver from the vehicle and put him

face-down on the ground, the driver continued to struggle to hold his hands under his body, and the officer delivered two closed-fist blows to the driver's back, still without subduing the driver, before finally employing the taser. *Id.* This resistance was obviously "active," in clear contrast to the facts here.

Finally, the remote risk that C.S. could have been armed does not establish that he posed a reasonable threat of danger. This is not a case like *Watson v. City of Marysville*, where we upheld the use of a taser when a suspect was told beforehand that he would be tased if he touched his unsearched bag, which police had a reasonable basis to believe contained an assault rifle, but the suspect blatantly disregarded the order and reached into the bag anyway. 518 F. App'x 391–93 (6th Cir. 2013). As explained above, the jury here could find there was no objective basis for Jones to suspect that C.S. was armed.

Accordingly, C.S. had a clearly established constitutional right not be tased under the circumstances. Jones violated that right by tasing C.S. despite observing that C.S. was not resisting and expressed no verbal or physical behavior that was hostile or threatening. On these facts, a reasonable jury could find that use of a taser was not objectively reasonable and therefore amounted to excessive force under the law. Thus, the district court properly denied qualified immunity for the § 1983 claim.

## III.

Jones and Doyle also appeal the denial of summary judgment on the pendent state-law claims. They challenge the district court's determination on both qualified immunity grounds and on the merits, arguing that they cannot be held liable on the battery, negligence, and gross negligence claims as a matter of law. We have appellate jurisdiction to review the qualified immunity determination with respect to all three state claims. Based on our analysis of the § 1983 claim, the district court properly ruled that Jones is not entitled to qualified immunity on C.S.'s battery claim. Jones's merits challenge to the battery claim, which is inextricably intertwined with the immunity analysis and thus subject to our pendent appellate jurisdiction, likewise fails. However, the district court improperly denied Jones's and Doyle's motions for summary judgment on the negligence and gross negligence claims, because both defendants are

entitled to qualified immunity under Kentucky law for the performance of discretionary functions.  We lack pendent appellate jurisdiction to review defendants' merits challenges to the denial of summary judgment on the negligence claims.

**A.**

First, we have jurisdiction to review defendants' appeal from the denial of summary judgment on the pendent state claims.  "In a diversity case or a federal question action involving pendent state claims, we must look to state immunity law to determine whether a denial of immunity based on state law is appealable."  *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007).  "Kentucky permits interlocutory appeal to review a denial of qualified official immunity."  *Clemons v. Couch*, 768 F. App'x 432, 438 (6th Cir. 2019) (first citing *Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014); and then citing *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 886–87 (Ky. 2009)).  In *Breathitt*, the Supreme Court of Kentucky recognized that qualified immunity is intended to protect the possessor from the burden of trial as well as liability, and permitting interlocutory appeal is necessary to vindicate the entitlement before the party asserting the right must face the cost of defending the action. 292 S.W.3d at 886–87 (citing *Mitchell*, 472 U.S. at 525).  We therefore have jurisdiction to review defendants' interlocutory appeal of the denial of qualified official immunity for the battery, negligence, and gross negligence claims.  *See Williams v. Sandel*, 433 F. App'x 353, 359 (6th Cir. 2011).

Additionally, we have pendent appellate jurisdiction over defendants' merits-based challenges to the denial of summary judgment on the battery claim, but not the negligence and gross negligence claims.  Where the denial of summary judgment does not concern qualified immunity issues, we have discretion "'to exercise [pendent appellate] jurisdiction over issues that are not independently appealable when those issues are "inextricably intertwined"'" with issues we have jurisdiction to consider."  *McGrew v. Duncan*, 937 F.3d 664, 670 (6th Cir. 2019) (quoting *Chambers v. Ohio Dep't of Hum. Servs.*, 145 F.3d 793, 797 (6th Cir. 1998)).  To be inextricably intertwined, a claim must be "'coterminous with' or 'subsumed in' a claim within our jurisdiction."  *Id.* (quoting *Chambers*, 145 F.3d at 797).  Put differently, "[t]wo claims are inextricably intertwined if resolving one claim will necessarily determine the other."  *Novak v.*

*City of Parma*, 932 F.3d 421, 437 (6th Cir. 2019) (internal quotation marks and citation omitted). With respect to the battery claim, the qualified immunity analysis necessarily determines Jones's merits challenges, because the determination that Jones used excessive force when tasing C.S. resolves both the immunity issue and the merits arguments. Therefore, because the immunity and merits issues are inextricably intertwined, we exercise pendent appellate jurisdiction to review the merits arguments.

However, we lack pendent appellate jurisdiction over Jones's and Doyle's merits challenges to the denial of summary judgment on the negligence and gross negligence claims. In *McGrew*, we observed that the officers' governmental-immunity arguments in that case did not subsume their merits arguments, because immunity hinged on "*how* the officers acted," while the merits arguments turned on "*what* they did." 937 F.3d at 670 (emphasis in original). The same is true here. The qualified official immunity analysis depends on whether Jones's and Doyle's actions were discretionary or ministerial under Kentucky law. The merits arguments depend on an entirely separate analysis—whether Jones and Doyle violated a specific duty of care owed to the plaintiffs. Because the immunity analysis is not inextricably intertwined with the merits claims, we do not have jurisdiction to consider the merits arguments.

**B.**

Jones argues that the district court erred in denying his motion for summary judgment on C.S.'s battery claim on qualified official immunity grounds. However, because Jones's tasing of C.S. was a violation of C.S.'s clearly established constitutional rights under the Fourth Amendment, Jones is not eligible for state qualified immunity.

C.S. alleged that Jones committed battery under state law when he used his taser. The district court properly ruled that Jones was not entitled to qualified immunity on this claim. Under Kentucky law, "[q]ualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions . . . (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (internal citations omitted). With respect to the first prong, "the determination of the amount of force required to effect the investigatory stop or arrest is . . . a discretionary act."

*Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 31 (Ky. Ct. App. 2016). Jones's decision to use his taser on C.S. was therefore a discretionary act. The third prong is also not in dispute. It is the second prong of the immunity analysis that dooms Jones's appeal. The Supreme Court of Kentucky explained in *Yanero* that "in the context of qualified official immunity, 'bad faith' can be predicated on a violation of a constitutional, statutory or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.* objective unreasonableness." 65 S.W.3d at 523. As stated above, Jones did violate C.S.'s clearly established constitutional rights because his tasing of C.S. constituted excessive force and was objectively unreasonable. Consequently, Jones failed to satisfy the good-faith prong and is not entitled to qualified official immunity under state law.

Jones also asserts a merits-based challenge to the denial of summary judgment, arguing that: (1) his conduct did not rise to the level of a battery under the law and (2) he cannot be held liable because he is entitled to an affirmative defense under KRS § 503.090(1). We have jurisdiction to review these arguments because the analysis of the qualified official immunity claim necessarily determines these merits claims, meaning the two are inextricably intertwined. *Cf. Novak*, 932 F.3d at 437. Under Kentucky law, common-law battery is defined as "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Vitale v. Henchy*, 24 S.W.3d 651, 657 (Ky. 2000) (citation omitted). An officer is authorized to use the amount of force that the officer reasonably believes is necessary to effectuate an arrest, but no more. *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1972). The resolution of the qualified official immunity issue turned on our determination that Jones violated C.S.'s clearly established constitutional rights, because the use of the taser constituted excessive force. This determination resolves the merits arguments as well, because "[t]he use of excessive force by a police officer constitutes the intentional tort of battery." *See Ali v. City of Louisville*, No. 3:03CV–427–R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006). The excessive-force determination also resolves Jones's asserted affirmative defense, because although KRS § 503.090(1) permits the use of force in making an arrest, Kentucky courts have held that the statute permits only "less than excessive force." *Brown v. Fournier*, No. 2015-CA-001429-MR, 2017 WL 2391709, at *4 (Ky. Ct. App. June 2, 2017). Because a jury could find

that Jones used more force than was reasonably necessary under the circumstances, he is not entitled to summary judgment with respect to this defense. *Cf. id.* at *4–5.

Thus, the district court properly denied summary judgment on both qualified immunity grounds and on the merits of the battery claim.

## C.

Jones next challenges the district court's denial of his summary judgment motion on the state-law negligence and gross negligence claims arising from his decision to initiate and continue the pursuit of Embry's vehicle. Plaintiffs asserted that Jones was negligent and grossly negligent by continuing the high-speed pursuit despite the risk to the plaintiffs as passengers in the vehicle and to other vehicles on the road. Jones contends that that the district court erred in denying his claim for qualified official immunity on these claims. Because Jones's decision to continue the pursuit was a discretionary act, he is entitled to qualified official immunity under Kentucky law.

Jones is entitled to qualified official immunity on the negligence and gross negligence claims if his conduct was: (1) a discretionary act or function, (2) performed in good faith, and (3) within the scope of his authority. *Yanero*, 65 S.W.3d at 522. Only the first prong is at issue here—whether Jones's conduct was discretionary or ministerial. Immunity does not attach for a ministerial act, which "requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* Conversely, a discretionary act entails "the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.*

Jones's actions during the pursuit and his decisions related to initiating and continuing the pursuit were not ministerial acts that were dictated by law enforcement department policies. Plaintiffs' claim is based on Jones's "failure to discontinue the pursuit." The issue therefore is not how Jones operated his vehicle during the pursuit, but whether he should not have initiated the pursuit in the first place or terminated it earlier. *Cf. Mattingly v. Mitchell*, 425 S.W.3d 85, 90 (Ky. Ct. App. 2013). Thus, the relevant inquiry is whether Jones's act of initiating and continuing the pursuit was a discretionary act or a ministerial duty controlled by official

departmental policy. The ECSO policy regarding "Pursuit and Emergency Response Driving" provides:

> K.R.S. Chapter 189 sets forth traffic law exemptions for the operation of emergency vehicles during vehicular pursuits . . . but, at the same time, mandates due regard for the safety of all persons and property on the highway. The E.C.S.O. will apprehend fleeing violators when conditions exist that do not endanger the lives, property, or safety of motorists, citizens or other members of the E.C.S.O. The protection of life and property must be the primary concern in the operation of emergency vehicles.
>
> It is impossible to develop guidelines to cover every conceivable situation that may occur. Therefore, it is important that all employees follow the guidelines outlined in the following directive, exercise their best judgment in emergency vehicle operation, and fully utilize their training, experience, and common sense.
>
> The decision to initiate pursuit . . . driving will be discretionary with each individual officer. The officer must weigh the need for immediate apprehension against the risk created to all others by the pursuit. The factors to be considered in initiating and continuing a pursuit . . . should include, but are not limited to the following:
>
> 1. Seriousness of the . . . violators offence (i.e., if the offender is allowed to flee, he would present a danger to human life or cause serious physical injury.);
> 2. Identify the offender, if known, and the likelihood of apprehension;
> 3. Factors such as pursuit/emergency response speed, weather, roadway conditions, time of day, location of the pursuit/emergency response, and the condition and capabilities of the pursuit and pursued vehicles;
> 4. Amount of vehicular and pedestrian traffic.
>
> OFFICER RESPONSIBILITIES IN EMERGENCY RESPONSE DRIVING
>
> 1. The officer shall have his siren and emergency lights operational and shall continue to have them operational throughout the emergency response driving situation.
> 2. The officer will notify dispatch when initiating the pursuit, all information about the pursued vehicle, location, direction of travel, and upon terminating the pursuit.
> 3. The officer will use extreme caution in condensed traffic areas such as commercial, residential, or school zones.
> 4. The officer shall slow down upon approaching any red light or stop sign, and only proceed through when it is safe to do so.

5.  The officer will operate his emergency vehicle with due regard for the safety of all persons and property upon the highway.
6.  The officer will maintain reasonable control of his vehicle at all times.
7.  The officer will use his discretion and terminate the pursuit if the danger to human life is greater than the need to continue the pursuit. Is the pursued person a danger to the public if not apprehended?

The language of the ECSO policy on police pursuits shows that Jones's actions were discretionary in nature. The policy provides that the "decision to initiate pursuit . . . *will be discretionary* with each individual officer" and "[t]he officer will *use his discretion* and terminate the pursuit . . . ." The policy does not absolutely mandate when a pursuit must be initiated or when an officer must discontinue pursuit. The policy simply lays out factors for the officer to consider when making that decision based on the circumstances. To be sure, the Supreme Court of Kentucky stated in *Yanero* that "[a]n act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." 65 S.W.3d at 522 (citation omitted). Consequently, "[b]ecause few acts are purely discretionary or purely ministerial, the courts must look for the 'dominant nature of the act.'" *Mattingly*, 425 S.W.3d at 89–90 (quoting *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010)). The language of the ECSO policy reveals that dominant nature of the decision to start or end a pursuit is a discretionary one because the policy does not set any absolute constraints on the officer's exercise of discretion to continue a pursuit—it merely provides factors for the officer to consider.

It is true that in two cases, *Mattingly*, 425 S.W.3d at 85, and *Browder v. Fentress*, No. 2013-CA-002178-MR, 2018 WL 3202975 (Ky. Ct. App. June 29, 2018), Kentucky courts held that the decision to initiate, continue, or terminate a pursuit was ministerial. However, those cases are readily distinguishable because the departmental pursuit policies at issue in those cases granted substantially less discretion than the ECSO policy here, and the officers in those cases violated the ministerial portions of their respective pursuit policies.

First, *Mattingly* is inapposite here. In *Mattingly*, the Kentucky Court of Appeals stated that "[w]hatever discretion Mattingly may have had in initiating and continuing a pursuit, it was limited by the Louisville Metro Police Department's Standard Operating Procedures."

425 S.W.3d at 90. The court pointed to the fact that "those procedures provide specific directives to its officers when initiating or engaging in a pursuit" and that the "repeated use of the term 'shall' establishes that compliance with its provisions" involved execution of specific, ministerial acts. *Id.* (citing *Yanero*, 65 S.W.3d at 522). The court held that because Mattingly's pursuit "constituted an 'identifiable deviation from an absolute, certain, and imperative' order," he had violated the ministerial aspects of the procedures and was not entitled to qualified immunity. *Id.* (quoting *Haney*, 311 S.W.3d at 245). However, the policy in *Mattingly* is materially different from the ECSO policy here. The police department policy in *Mattingly* specifically mandated when an officer was permitted to initiate or was required to terminate a pursuit, providing, in relevant part:

> RESPONSIBILITIES OF PRIMARY UNIT
>
> S.O.P. 12.1.3 states:
>
> The decision to initiate a pursuit must be based on the pursuing officer's reasonable belief that the suspect is a felon or suspected felon. The officer must weigh the immediate danger or potential danger to the public should the suspect be allowed to remain at large against the danger or potential danger created by the pursuit itself.
>
> . . .
>
> The officer initiating the pursuit shall, as soon as practical, provide the following information by radio:
>
> • Car number
> • Location
> • Direction of travel
> • Approximate speed
> • Reason for pursuit
> • Vehicle description
> • License number if known
> • Number and description of occupants
> • Traffic conditions
>
> Failure to provide the information to MetroSafe shall result in an immediate termination of the pursuit by a commanding officer. The initiating unit shall be in command and bear operational responsibility for the pursuit until the pursuit is acknowledged by a commanding officer.

Unmarked and specialty vehicles shall have a fully marked police vehicle involved in the pursuit as soon as possible. The marked unit shall take over the primary unit position when feasible. Police vehicles and rental vehicles without emergency lights and siren are prohibited from participating in a pursuit.

POLICY REVIEW: PURSUITS NON INITIATION OF PURSUITS

S.O.P. 12.1.9 states:

Officers shall not initiate or participate in a pursuit when:

• The offense is a traffic infraction or misdemeanor.
• The offense is a non-violent felony wherein the suspect is known.
• When passengers or prisoners are in the police vehicle.

POLICY REVIEW: PURSUITS TERMINATION

S.O.P. 12.1.10 states:

Pursuits shall be terminated when the risks created by continuing the pursuit outweigh the need for immediate apprehension.

An officer's decision to terminate a pursuit for safety reasons is not subject to criticism or review.

Pursuits shall be terminated immediately when the following occur:

• A supervisor in charge of the pursuit or a higher-ranking officer orders it terminated.
• The officer loses visual contact and the likelihood for apprehension is lessened.
• The officer doesn't believe it to be safe to continue the pursuit.
• The officer is lost and unfamiliar with the area.
• The officer is out of radio range or loses contact with communications.

*Id.* at 87–88. These procedures clearly and absolutely prohibit officers from initiating or continuing a pursuit if certain fixed facts occur. Conversely, in the ECSO policy above, all of the mandatory requirements for officers relate to their *conduct during a pursuit*, such as notifying dispatch of the pursuit, using caution while driving, and slowing down near red lights and stop signs. But the only requirement with respect to the decision to discontinue the pursuit is that the officer use his or her discretion to see if the danger to human life is greater than the need to continue the pursuit. There are no "specific directives" that predetermine the exercise of discretion here as there were in *Mattingly*. *Id.* at 90. For example, if the Louisville Metro Police officers fail to disclose the necessary information to MetroSafe, they are *required* to terminate the pursuit. *Id.* at 88. Although the ECSO policy contains a similar reporting requirement, there

is nothing in the policy that curbs an officer's discretion and requires the officer to terminate the pursuit if the officer fails to satisfy a certain condition or obligation.  Furthermore, the denial of qualified official immunity in *Mattingly* rested on the fact that the officer had violated those mandatory (and ministerial) procedures in the policy.  *Id.* at 90–91.  Here, plaintiffs do not argue, and the district court did not identify, any mandatory procedures in the ECSO policy that Jones violated during the pursuit.

Further, *Browder* does not apply here for the same reasons.  2018 WL 3202975 at *1.  There, the Hardin County Sheriff's Department had "*specific and comprehensive* procedures that deputies are required to follow when initiating, continuing, and terminating vehicular pursuits of suspects."  *Id.* at *3 (emphasis added).  The ECSO policy provides a non-exhaustive list of factors that officers must consider, but the policy in *Browder* laid out specific conditions for the initiation or termination of a pursuit.  *Id.* at *2.  The court denied qualified immunity in *Browder* because the officer actually admitted that "he did not follow the procedure requiring him to terminate pursuit if he was unable to contact a supervisor."  *Id.* at *3.  Here, there is no concrete rule describing when an officer must terminate a pursuit, no express prior condition that an officer must satisfy in order to continue the pursuit, and there is no indication that Jones violated any mandatory department policy related to his decision to continue the pursuit.

Therefore neither *Mattingly* nor *Browder* controls this case.  The policy here is materially different from the policies at issue in *Mattingly* and *Browder*.  The dominant nature of the ECSO policy is that officers retain broad discretion to decide when to initiate and terminate a pursuit.  That they must take some factors into account when making that decision does not in any way confine their discretion or place any obligations upon them.  This conclusion is further supported by other Kentucky cases where courts have found that the decision to initiate, continue, and terminate a pursuit is discretionary.  *See, e.g.*, *City of Brooksville v. Warner*, 533 S.W.3d 688, 694 (Ky. Ct. App. 2017).  In *Pugh v. Meinhart*, the Kentucky Court of Appeals reasoned that a policy was discretionary because "while Pugh was required to consider the factors listed in the S.O.P., he had to exercise his own discretion before deciding to begin, continue, or end the pursuit."  No. 2017-CA-000043-MR, 2018 WL 7890681, at *3 (Ky. Ct. App. Mar. 29, 2018).

Thus, because Jones's decision to continue the pursuit was a discretionary act, Jones was entitled to summary judgment on the basis of qualified official immunity under Kentucky law on the negligence and gross negligence claims.

**D.**

Finally, Doyle appeals from the district court's denial of his motion for summary judgment on plaintiffs' negligence and gross negligence claims. Plaintiffs alleged that Doyle was negligent in permitting Jones and Meredith to continue pursuing Embry's vehicle and not enforcing the ECSO pursuit policy. Doyle contends that he is entitled to qualified official immunity under state law on both claims. Because Doyle's involvement in the pursuit entailed purely discretionary acts, he is entitled to immunity on both claims, and the denial of summary judgment was in error.

Doyle is entitled to qualified official immunity on plaintiffs' negligence claims under Kentucky law. Only the first qualified immunity prong is at issue here—whether Doyle's involvement in overseeing the pursuit was discretionary or ministerial. *See Yanero*, 65 S.W.3d at 522. Doyle's conduct of loosely supervising Jones and other officers during the pursuit was discretionary in nature. "Kentucky courts have repeatedly held that supervising employees is a discretionary function subject to the defense of qualified official immunity." *Jackson v. Pullen*, No. 2013-CA-001398-MR, 2014 WL 6879246, at *3 (Ky. Ct. App. Dec. 5, 2014) (collecting cases).

Doyle's involvement in the pursuit, and his request to stay informed, did not mean that he had a ministerial duty to enforce ECSO policies during the pursuit. Again, a duty is ministerial when it is "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522. First, that the dispatch center was told to inform Doyle of the pursuit did not establish an imperative duty on Doyle's part. The ECSO policy states only that the pursuing officer must notify the dispatch center, not that the Sheriff must be informed. Further, Doyle's statement to Meredith's partner that he "keep [Doyle] informed" likewise does not suggest that Doyle was executing some mandatory ECSO procedure. We observed in *Hedgepath v. Pelphrey* that "supervision of employees is a

ministerial act when it merely involves enforcing known policies." 520 F. App'x 385, 392 (6th Cir. 2013) (citing *Yanero*, 65 S.W.3d at 522). But plaintiffs here failed to identify a relevant policy requiring Doyle to supervise the officers, so Doyle's conduct was not ministerial.

As the district court recognized, there is "no written policy establishing a supervisory duty over pursuits on the part of Doyle." *Browning*, 2020 WL 4718763, at *14. "[W]here the alleged ministerial duty is not found in a statute, regulation, written policy, or even common law, there must be a widely accepted rule or practice that is known to all in that field and mandated in the circumstances." *Ritchie v. Turner*, 559 S.W.3d 822, 841 (Ky. 2018) (internal citation omitted). There is no suggestion from the plaintiffs that Doyle's supervision over the pursuit would meet such an exacting standard. Thus, because Doyle's involvement in the pursuit in this case entailed purely discretionary conduct, he is entitled to qualified official immunity under Kentucky law.

**IV.**

For the foregoing reasons, with respect to the claims on appeal, we affirm the district court's denial of summary judgment with respect to the § 1983 claim and the state law battery claim asserted against Jones, and reverse the denial of summary judgment with respect to the state law negligence and gross negligence claims asserted against both Jones and Doyle.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

MURPHY, Circuit Judge, concurring in part and dissenting in part. If you were a police officer, what risk of getting shot would you be willing to face before using your taser to incapacitate a suspect who may (or may not) be armed after he appeared to ignore your commands to show his hands? A 25% risk? 10%? 5%? 1%? It seems to me this is the basic question that Officer Jordan Jones needed to answer in a matter of seconds when he decided to deploy his taser on C.S. while securing the accident scene following a high-speed chase. My colleagues say that the risk that C.S. had a firearm was too "remote" to make Jones's use of a taser objectively reasonable. I do not think that our cases clearly establish that conclusion, so I must respectfully dissent from their decision to deny Jones qualified immunity on C.S.'s excessive-force claim. For the same reason, I would also grant Jones qualified immunity under Kentucky law on C.S.'s state-law battery claim. In all other respects, though, I concur in the majority's thoughtful opinion.

The ground rules for C.S.'s excessive-force claim are well established. To overcome Jones's qualified-immunity defense, C.S. must show both that Jones committed a constitutional violation and that any reasonable officer in his position would have known that his conduct exceeded constitutional bounds. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

To meet the first qualified-immunity element, C.S. must establish that Jones's use of a taser was an "unreasonable seizure" under the Fourth Amendment. When analyzing this type of excessive-force claim, the Supreme Court looks to the totality of the circumstances of the encounter. *See Rivas-Villegas v. Cortesluna*, __ U.S. __, 2021 WL 4822662, at *2 (Oct. 18, 2021) (per curiam) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court has emphasized three recurring questions: What was the severity of the crime that the officer was investigating? What risk did the plaintiff pose to the officer's safety? And was the plaintiff actively or passively resisting the officer before the use of force? *See id.* The Court also requires us to answer these questions (and evaluate all of the circumstances) "from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

To meet the second qualified-immunity element, C.S. next must show that Jones's use of a taser violated "clearly established" law. *See Wesby*, 138 S. Ct. at 589. This "clearly established" limitation on § 1983 liability ensures that Jones had "fair notice" of what the Constitution commanded of him. *Rivas-Villegas*, 2021 WL 4822662, at *2. And the law cannot be described as "clearly established" unless every reasonable officer in Jones's position would have recognized the unconstitutionality of his conduct, such that Jones was "plainly incompetent" to think that his actions passed muster. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)).

Combining the Fourth Amendment's fact-specific test with qualified immunity's fair-notice test makes this defense especially difficult to defeat for plaintiffs who allege excessive-force claims. The Supreme Court's many decisions granting qualified immunity to officers on these claims illustrate this point well. *See, e.g.*, *Rivas-Villegas*, 2021 WL 4822662, at *2–3; *City of Tahlequah v. Bond*, __ U.S. __, 2021 WL 4822664, at *2–3 (Oct. 18, 2021) (per curiam); *City of Escondido v. Emmons*, 139 S. Ct. 500, 503–04 (2019) (per curiam); *Kisela*, 138 S. Ct. at 1153–54; *White*, 137 S. Ct. at 550–52; *Mullenix v. Luna*, 577 U.S. 7, 11–18 (2015) (per curiam); *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 613–17 (2015). A plaintiff cannot argue simply that the Supreme Court has "clearly established" that the police may not use excessive force or that the force must be objectively reasonable under the circumstances. *See Emmons*, 139 S. Ct. at 503; *Sheehan*, 575 U.S. at 613. These *general* legal tests typically will not show that an officer's *specific* use of force was plainly excessive. *See Rivas-Villegas*, 2021 WL 4822662, at *2. In all but the most egregious of cases, the plaintiff instead "must identify a case that put [the officer] on notice that his specific conduct was unlawful." *Id.* And if a circuit court's prior cases are "materially distinguishable," they cannot provide the required notice. *Id.* at *3.

We may resolve this two-part qualified-immunity test in any order we choose, so I would jump immediately to the clearly established prong. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). C.S. has not identified a sufficiently analogous case that would have put Jones on notice that his use of the taser was excessive under the circumstances.

To answer this clearly established question, we must consider the objective reasonableness of Jones's conduct from his perspective based on the "particularized" facts that he confronted. *Thomas v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017) (quoting *Pauly*, 137 S. Ct. at 552). Jones knew that the driver of a Pontiac Grand Am (Brandon Embry) had sped off after a fellow officer had attempted to stop him for an unilluminated license plate and a backseat passenger (C.S.) who was not wearing a seatbelt. The driver led Jones on a dangerous chase that exceeded 130 miles per hour. As Jones pursued the Grand Am, he watched it fishtail and drive dangerously. He also observed a person in the car throw items out of it. An officer who located the items radioed to Jones that "there was ammunition being thrown out of the vehicle." Jones Dep., R.73-1, PageID 1113. An officer also radioed that the Grand Am belonged to a "wanted subject," but Jones could not recall the charges. *Id.*, PageID 1117. Jones ultimately witnessed the Grand Am get "t-boned" by another vehicle at an intersection.

When Jones approached the crashed Grand Am, he saw Embry (the driver) attempting to get out and appearing as if he wanted to run. Jones punched Embry to stop him. After Jones handcuffed Embry and placed him on the ground, Jones looked in the rear of the Grand Am. He could see a person (who turned out to be C.S.) "slumped over kind of rocking back-and-forth[.]" *Id.*, PageID 1120. He gave this person "multiple commands" to show his hands, but the person did not comply. *Id.* After Jones broke the rear window with his baton, the person was still rocking and not showing his hands. *Id.* Because of the earlier mention of ammunition, Jones was concerned that this passenger might be attempting to hide a weapon. Jones thus brandished his taser and fired it when the passenger did not comply with a fresh set of warnings.

We must ask: Did our cases clearly establish that Jones could not tase a passenger in a crashed vehicle who did not show his hands upon request and who Jones suspected might be hiding a firearm in the uncertain moments following a high-speed chase? I do not think so. Whether or not the use of the taser actually violated the Fourth Amendment, our caselaw would

not have made Jones "plainly incompetent" in thinking that it did not. *See Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551). Jones could have reasonably believed that the tasing was constitutionally permissible based on the three general questions that the Supreme Court uses for evaluating excessive-force claims. *See Graham*, 490 U.S. at 396.

*Question One: Was the crime serious?* To begin with, none of our cases would have barred Jones from believing that he was investigating a serious crime. *See id.* To be sure, the fellow officer sought to stop the Grand Am for minor traffic violations. But Embry fled at dangerously high speeds in violation of Kentucky law. *See* Ky. Rev. Stat. Ann. 520.095(1)(a)(4). And while C.S. was a passenger rather than the driver who committed this felony, our cases have not distinguished between the driver and passengers following high-speed chases. Even when a passenger brought an excessive-force claim, we noted: "Because the crime involved fleeing from law enforcement, the severity of the crime was great." *Tallman v. Elizabethtown Police Dep't*, 167 F. App'x 459, 466 (6th Cir. 2006); *see Scott v. Clay County*, 205 F.3d 867, 877 (6th Cir. 2000).

*Question Two: Was there a risk of harm to Jones?* More critically, none of our cases would have barred Jones from concluding that the risk that C.S. had a firearm was sufficiently great to justify the use of a taser. *See Graham*, 490 U.S. at 396. Jones knew that ammunition had been thrown from the car, and C.S. was rocking back and forth in a way that looked like he was "attempt[ing] to conceal something from Jones." *Browning ex rel. C.S. v. Edmonson County*, 2020 WL 4718763, at *4 (W.D. Ky. Aug. 13, 2020). I readily acknowledge that these facts would not give Jones probable cause to conclude that C.S. possessed a gun or posed "a threat of serious physical harm" to Jones. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). But that probable-cause test, if met, would have allowed Jones to use *deadly* force. *See id.* Here, we are considering only whether Jones could use a taser—a level of force that C.S. admitted caused him no injuries. C.S. Dep., R.77-1, PageID 1380–81. When balancing the interests on all sides, I would think that even a modest risk of life-threatening harm to an officer can justify the use of a lower level of force (and a corresponding lower risk of serious injury to the suspect). *Cf. United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.).

Still, what is the specific level of risk of getting shot that an officer must identify to render the use of a taser objectively reasonable? Should it be the reasonable suspicion test from *Terry v. Ohio*, 392 U.S. 1 (1968)? Something lower? Something higher? I am unsure, which means I do not think our caselaw clearly establishes the answer. Indeed, our prior cases "have found no clearly established right of a suspect to be free from tasing where he or she disobeys police orders and may be in possession of a weapon." *Watson v. City of Marysville*, 518 F. App'x 390, 393 (6th Cir. 2013). In *Watson*, someone called the police about a suspicious man walking around with a rifle, and the plaintiff matched some of the man's characteristics. *Id.* at 391. Although it turned out the plaintiff was not the man with the gun, we found the risk that he was armed sufficient to justify the use of a taser when he disobeyed police orders not to reach into his bag. *Id.* at 393. Jones could reasonably believe that a similar risk existed based on the ammunition thrown from the Grand Am, the fact that the car's owner was wanted, and C.S.'s failure to show his hands. I do not think Jones had to categorically assume that the car's occupants had gotten rid of any and all guns and ammunition simply because *some* ammunition had been thrown out. C.S.'s expert admitted as much. When asked whether an officer would have had a reasonable suspicion that a subject in the car might be armed based on the fact that ammunition had been thrown from the car, he replied: "Yeah. You can have a reasonable suspicion. Yeah. You could have." Fryer Dep., R.68-1, PageID 686.

On the other hand, we have suggested that the mere possession of a gun does not *alone* suffice to justify the use of a taser when a suspect's "hands [are] in the air and he [is] not resisting." *Correa v. Simone*, 528 F. App'x 531, 534 (6th Cir. 2013). But Jones could have found *Correa* "materially distinguishable" from his circumstances. *Rivas-Villegas*, 2021 WL 4822662, at *2. After all, the district court acknowledged that Jones could not see C.S.'s hands and C.S. appeared to be "attempt[ing] to conceal something from" him. *Browning*, 2020 WL 4718763, at *4.

Does it matter, though, that C.S. was actually unconscious after the crash and regained consciousness only outside? Or that Jones later admitted that C.S.'s rocking could have been caused by the Grand Am still moving after the crash? Or that C.S. had not thrown things out of the car? (Another passenger testified that it was Embry who had thrown out the items, including

a gun.)  I would think that any reliance on these facts would violate the rule that we must analyze the use of force from Jones's perspective at the time and not with hindsight bias.  *Graham*, 490 U.S. at 396.  All told, then, our cases do not show that Jones acted incompetently in using his taser based on the risk that C.S. was armed.

My colleagues respond that a reasonable jury could find it objectively unreasonable for Jones to believe that C.S. might have had a firearm.  I disagree.  To begin with, I do not think this question is a factual one (for the jury) rather than a legal one (for the court).  As we have recognized, the Supreme Court has held that the ultimate issue—whether the facts construed in the light most favorable to the plaintiff rise to the level of unconstitutionally "excessive force"—is one of law for the court.  *Stricker v. Township of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)); *see Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017).  So it is a legal question whether this case's facts (construed in C.S.'s favor) created a sufficient risk of harm to Jones to render his use of a taser objectively reasonable.

An analogy illustrates the point.  Officers may use deadly force if the facts establish that they had "probable cause to believe" that a suspect "pose[d] a threat of serious physical harm" to them.  *Garner*, 471 U.S. at 11.  And we have held that the question whether probable cause exists is a legal one for the court.  *See Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020); *Scott*, 205 F.3d at 877 n.16.  The same rule should apply when deciding whether a sufficient risk existed (short of probable cause) to make Jones's use of a taser reasonable.

The Supreme Court's decision in *Mullenix* also illustrates this point.  In that case, an officer fired at a vehicle and killed the driver in the midst of a high-speed chase.  577 U.S. at 8.  The Fifth Circuit originally held that summary judgment was improper because the "immediacy of the risk posed by [the driver was] a disputed fact that a reasonable jury could find" in either party's favor.  *Id.* at 10 (citation omitted).  A dissenting judge pointed out that this "fact issue" was really a restatement of the objective-reasonableness test and so a legal question for the court.  *Id.* (citation omitted).  On rehearing, the panel filed a new opinion agreeing that this issue raised a legal question, but now holding that the officer's actions had been unreasonable because the driver's threat level did not justify deadly force.  *Id.* at 11.  The Supreme Court reversed the Fifth

Circuit's denial of qualified immunity, reasoning that no case would have clearly established that the officer had acted unreasonably under the circumstances in concluding that the driver represented a threat of serious injury to the officers. *Id.* at 11–19. That is the same basic approach I would take here: None of our cases clearly established that Jones acted unreasonably in concluding that C.S. posed a risk of harm sufficient to warrant the use of a taser.

I also do not read *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020), to establish a different test. In that case, we held that a jury could find that an officer used objectively unreasonable force when deploying a taser on the plaintiff during a traffic stop. But the officer had no objective basis for concluding that the plaintiff had a weapon. *Id.* at 861, 867. At most, the officer claimed that he thought the plaintiff had been reaching into his vehicle's center console and that it may have contained a gun, but the plaintiff "dispute[d] that his hand movement was threatening to the extent that he moved his hand at all." *Id.* at 867. This disagreement over the "historical" facts of what happened strikes me as one for the jury. Yet I do not see any disputes over the historical facts in this case; the parties simply dispute the objective-reasonableness inference to draw from those facts. *Wright* also could not have clearly established that Jones's risk assessment was objectively unreasonable because that decision came out only after the events at issue in this case. *See Thomas*, 715 F. App'x at 461.

*Question Three: Was C.S. resisting actively or passively?* My colleagues rely heavily on the Supreme Court's third question, which considers whether C.S. was actively or passively resisting. *See Graham*, 490 U.S. at 396. Our cases suggest that officers may tase suspects who "actively" resist but may not tase those who only "passively" resist. *See Thomas*, 715 F. App'x at 460; *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). For two reasons, I do not think that these cases clearly establish that Jones's actions violated the Fourth Amendment.

For one thing, most of these cases are "materially distinguishable" from this one because they address the circumstances in which officers may use a taser to arrest a person who poses *no* risk of harm to the officer. *Rivas-Villegas*, 2021 WL 4822662, at *2. That is precisely why the cases focus on the Supreme Court's third question about resistance (not its second question about the threat of harm). Consider *Eldridge v. City of Warren*, 533 F. App'x 529 (6th Cir. 2013). There, we held that an officer used excessive force by tasing a diabetic in the midst of a

hypoglycemic episode after the person did not get out of a car upon repeated requests. *Id.* at 531–32, 535. But we found that the Supreme Court's "first two factors" (the severity of the crime and threat to the officers) were "not at issue." *Id.* at 532. Nowhere did the officers identify any objective evidence that the plaintiff had a gun; they thought only that he had been driving under the influence of alcohol. *Id.* Or consider *Cockrell v. City of Cincinnati*, 468 F. App'x 491 (6th Cir. 2012). There, an officer used a taser on a jaywalker without warning when the jaywalker ran away from the officer. *See id.* at 492. We granted qualified immunity to the officer even while conceding that the jaywalker had not threatened him. *Id.* at 496. We reasoned that none of our cases clearly established that an officer could not use a taser to subdue a non-threatening person suspected of committing a misdemeanor. *Id.* Here, however, Jones did not tase C.S. to make sure he did not escape; he tased C.S. because he thought C.S. might have a dangerous weapon. Given that risk, this case presents an easier call for qualified immunity than *Cockrell*.

For another thing, our caselaw leaves the distinction between "active" and "passive" resistance opaque. Some cases suggest that active resistance includes merely "disobeying officers." *Rudlaff*, 791 F.3d at 641 (quoting *Cockrell*, 468 F. App'x at 495); *see Caie v. West Bloomfield Township*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012). Others say noncompliance with an officer's order qualifies as "passive" resistance without "something more," such as "volitional and conscious defiance" of that order (whether verbal or physical). *Eldridge*, 533 F. App'x at 533–35. We thus have granted qualified immunity when it was unclear on which side of this active-passive line a case fell. In *Thomas*, for example, an officer walked toward a person suspected of fighting and ordered him to the ground. 715 F. App'x at 459, 461. When the person simply walked away, the officer fired his taser. *Id.* We granted the officer qualified immunity, reasoning that he could have viewed the walking away as "active" resistance. *Id.* at 461. Here, too, I would think that Jones could have reasonably concluded that—in addition to C.S.'s noncompliance with his orders to show his hands—the risk that C.S. had a gun constituted "something more." *Eldridge*, 533 F. App'x at 535.

\* \* \*

One last point, turning to C.S.'s state-law battery claim. C.S. appears to agree that he could not defeat Jones's qualified-immunity defense under Kentucky law if Jones is entitled to qualified immunity under federal law. Appellee Br. 33–34; *cf. Jones v. Clark County*, 959 F.3d 748, 778 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part). Because I would grant Jones qualified immunity on C.S.'s federal claim, therefore, I would also grant him qualified immunity on this state-law battery claim.

For these reasons, I respectfully concur in part and dissent in part. I would reverse the denial of summary judgment on all claims on appeal.