RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JOSEPH MEADOWS,

               *Plaintiff - Appellee*,

  *v.*

CITY OF WALKER, MICHIGAN,

               *Defendant*,

STEVE DUMOND and CHRIS WIETFELDT, in their individual and official capacities,

               *Defendants-Appellants*.

> No. 21-1548

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cv-00203—Robert J. Jonker, District Judge.

Argued: January 13, 2022

Decided and Filed: August 18, 2022

Before: GIBBONS, ROGERS, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee. **ON BRIEF:** Jeffrey C. Gerish, Robert A. Callahan, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. Amy J. DeRouin, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee.

     ROGERS, J., delivered the opinion of the court in which GIBBONS, J., joined. NALBANDIAN, J. (pp. 11–20), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  Joseph Meadows claims that officers used excessive force to detain him one night during a traffic stop.  Officer Steve Dumond began pursuing Meadows after he passed Dumond on the highway while traveling nearly ninety miles per hour.  During the subsequent traffic stop, which was captured on dash-camera footage, Dumond instructed Meadows to keep his hands out of his vehicle and to open the door to his vehicle.  Dumond and Meadows shouted back and forth as Meadows attempted to open his door.  Once Meadows exited the vehicle, Dumond grabbed Meadows and slammed him to the ground.  On the ground, Dumond kneed Meadows to try and roll him over, and Officer Chris Wietfeldt punched Meadows multiple times.  Wietfeldt also fractured Meadows's wrist while handcuffing him.  Meadows sued the officers and the City of Walker under 42 U.S.C. § 1983.  The officers contend that they are entitled to qualified immunity and appeal the district court's denial of summary judgment in their favor.  Their arguments reject any conclusion that the officers could see that Meadows's actions were compliant and that he was not resisting arrest.  The officers are not entitled to summary judgment because, on interlocutory appeal, we may not review their arguments challenging the factual disputes identified by the district court.

On August 29, 2017, Joseph Meadows passed Officer Steve Dumond on I-96 at night while traveling nearly ninety miles per hour.  Almost immediately after Meadows passed him, Dumond changed lanes to follow Meadows.  About eleven seconds later, Dumond activated his police lights; at this point, Meadows had gained several car lengths of separation between him and Dumond, and there was at least one other vehicle on the road in front of Meadows.  Over the next thirty seconds, Meadows drifted between lanes on the highway, and Dumond closed the distance between him and Meadows to a few car lengths.  Meadows then took the first exit off the interstate after Dumond activated his police lights.  Meadows drove to the end of the exit ramp and pulled to the side of the road in the right-turn lane.

After leaving and returning to his vehicle once, Dumond approached Meadows's vehicle with a flashlight in his left hand and his firearm in his right hand pointed at the ground.  Dumond

yelled, "turn off your truck; put your hands out the window." Meadows complied and placed both of his hands out the driver-side window of his vehicle. It is not clear from the video whether Meadows turned his vehicle off. Dumond, however, never asked Meadows to turn his vehicle off again and does not allege that Meadows refused to comply with that command. Dumond then told Meadows to "undo [his] door." Meadows said "yes sir" and then pulled his left arm back into the vehicle. Meadows later testified that he put his left hand in his vehicle "to hit the door handle to open the door to get out of the truck." Dumond yelled, "don't reach back inside your f****** vehicle," and Meadows immediately complied and put his left hand back outside the driver-side window. While still in his vehicle, Meadows explained that Dumond had told him to open the door, and Dumond instructed him to open the door from the outside. Dumond then told Meadows "do what you're told cause I'm not f****** around today."

Dumond instructed Meadows to unlock his door, and Meadows stated that the door was unlocked. Dumond then repeatedly told Meadows to open the door; Meadows explained that he was trying to open the door, and an audible thump on the dash-camera footage is consistent with Meadows's pulling on the door handle outside his car. Having watched Meadows fail to open the door, Dumond asked Meadows again if the door was locked. Meadows then asked for Dumond to give him a second, and Dumond told Meadows to stop reaching his hand inside the vehicle, while Dumond simultaneously raised his firearm and pointed it at Meadows for the first time. Meadows explained to Dumond that he was not trying to reach into his vehicle, he was just trying to unlock his door. Officer Chris Wietfeldt then approached the passenger side of the vehicle aiming his firearm at Meadows. Meadows finally managed to unlock and open his door, and Dumond instructed Meadows to step out of the vehicle.

As the door opened, Dumond holstered his firearm. Meadows stepped out of the vehicle within five seconds of getting his door open and within ten seconds of Dumond's first command to get out of the vehicle. The moment Meadows stepped out of the vehicle, Dumond immediately grabbed Meadows and threw him to the ground. Officer Wietfeldt ran over to help subdue Meadows. After the initial takedown, Meadows was on his right side with his right arm between his body and the ground, and Dumond was using Meadows's left arm to keep him pinned to the ground. Dumond then shifted his body to where he was standing over top of

Meadows and told him to roll over. Immediately after Dumond told Meadows to roll over, Dumond kneed Meadows in his lower back. Wietfeldt then struck Meadows in either the shoulder or the head before striking him twice more in the side. At that point, the officers had turned Meadows so that his stomach was on the ground, and a second police vehicle arrived.

The dash-camera footage becomes less clear at this stage because the lights from the second police vehicle obscured what was happening between Meadows and the officers on the ground. A third officer came from the second vehicle and grabbed Meadows's legs to secure them while Dumond and Wietfeldt attempted to handcuff Meadows. The dash-camera footage does not clearly depict how the officers managed to handcuff Meadows, but the footage does show Wietfeldt holding Meadows's right arm perpendicular to Meadows's back while Meadows was facedown on the asphalt. Meadows alleges that he felt someone with one hand on his elbow and then one hand on his wrist before he felt a pop and sharp pain in his wrist. Meadows subsequently discovered that his wrist was fractured during the arrest.

Meadows was charged with operating a vehicle while intoxicated (third offense), resisting and obstructing police in the performance of their duties, operating a motor vehicle on a suspended/revoked license, and having an open container in his vehicle. He pleaded guilty to operating his vehicle while intoxicated, and the other charges were dropped.

Meadows subsequently filed suit against the City of Walker, Officer Steve Dumond, and Officer Chris Wietfeldt. Meadows brought excessive-force claims against the officers and a municipal-liability claim against the City of Walker. The defendants moved for summary judgment, with the officers arguing that they were entitled to qualified immunity.

The district court held argument on the defendants' motion and issued an oral ruling on the motion. Excessive force claims are analyzed under *Graham v. Connor*, which requires consideration of the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." 490 U.S. 386, 396 (1989). Applying *Graham*, the district court first concluded that Meadows's initial crime of speeding was a moderately severe crime. Turning to the second factor, the court recognized that "not knowing what's inside the cab is certainly a concern," but the court also

found that the officers had no objective evidence to believe Meadows posed any direct threat to the officers.  In reaching this conclusion about the second factor, the court noted that the footage showed "from the very first engagement between the two of them the citizen is compliant, polite, respectful, and it's the officer who initially escalates both verbally and with the firearm."

The court focused most of its analysis on whether Meadows was actively resisting arrest. Here, the court found several factual disputes that a jury could resolve in Meadows's favor. First, the court noted that the footage of the traffic stop showed "a citizen who is trying to be respectful, trying to comply, and is confused about how to do it because he's got his hands out, and then he is told to open the door."  The court also recognized that it was inconsistent for Dumond to instruct Meadows to put his hands out the window and then to open his door, and the court even posited, "What's the citizen to do?"  Next, with respect to the struggle on the ground, the court concluded that a reasonable jury could conclude that the struggle was "not because of anything the citizen is doing."  The court stated that Meadows was explaining that he was trying to comply and he was not resisting, and the court determined that a reasonable jury could agree with this factual assessment.  Based on these factual disputes, the court determined that "a reasonable jury can certainly conclude that to an objective officer—an objectively reasonable officer, the only thing [the officer is] seeing from this citizen is at most some kind of passive resistance, and I would say barely that."  Further, the court went on to conclude that a reasonable jury could conclude that Meadows was not resisting arrest as a matter of fact and, viewing these facts in Meadows's favor, Meadows was not actively resisting arrest, and the officers therefore used excessive force to slam Meadows to the ground and handcuff him.

The district court appeared to conclude that it is clearly established in the Sixth Circuit that an officer cannot use physical force on someone who is not actively resisting arrest.  Citing *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015), the district court relied on the "axis of passive resistance or active resistance that the case law . . . tries to guide us through."  *Rudlaff* explains that a "simple dichotomy thus emerges: When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot."  791 F.3d at 642.  Because the district court determined that a reasonable jury could conclude that Meadows was objectively not refusing to comply or resisting arrest, the

district court denied the officers' motion for summary judgment, and the officers have brought this interlocutory appeal.**[1]**

The officers argue on appeal that they reasonably perceived that Meadows was refusing to comply and resisting arrest. In their view, Meadows resisted arrest in several different ways. First, the officers assert that Meadows refused to pull over on the highway when Dumond activated his police lights. Next, the officers contend that Meadows refused to comply with orders to keep his hands out of his vehicle while he was supposed to be opening the door to his vehicle. Finally, the officers assert that once they had Meadows on the ground, he failed to comply with their orders for him to roll onto his stomach. Based on these facts, the officers argue that they did not use excessive force to subdue and arrest Meadows.

In its denial of the motion for summary judgment, the district court identified several genuine disputes of material fact that would allow a reasonable jury to reject the officers' factual assertions. The district court pointed out that Dumond did not activate his siren when he activated his lights, and that once Dumond did activate his siren, Meadows stopped his car at the end of the interstate exit. As a result, a reasonable jury could reject the factual assertion that Meadows refused to promptly pull over and instead conclude that no reasonable officer could have perceived Meadows to be resisting arrest.

With regard to the traffic stop, the district court found that the dash-camera footage showed "a citizen who is trying to be respectful, trying to comply, and is confused about how to do it because he's got his hands out [the window], and then is told to open the door." Further, a reasonable jury could conclude that the physical struggle on the ground was "not because of anything the citizen [was] doing." The court noted that the dash-camera video did not show Meadows punching back, and a reasonable jury could conclude that the officers knew Meadows was not resisting their attempts to handcuff him. In sum, the court determined that a reasonable jury could conclude that Dumond and Wietfeldt did not perceive Meadows as refusing to comply or resisting arrest.

---

**[1]**The district court also denied summary judgment on the municipal-liability claim, but the city has not appealed that decision and that claim is therefore not part of this interlocutory appeal.

On interlocutory appeal, we are bound by the district court's determinations about genuine disputes of fact, even if the panel would reach a different conclusion reviewing the facts de novo. Under *Johnson v. Jones*, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets for[th] a 'genuine' dispute of fact for trial." 515 U.S. 304, 319–20 (1995). Moreover, "a defendant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (citing *Romo v. Largen*, 723 F.3d 670, 673–74 (6th Cir. 2013)). We are therefore bound by the district court's determination that a reasonable jury could conclude that Dumond and Wietfeldt did not perceive Meadows as refusing to comply or resisting arrest.

There is an exception to that rule when the district court's determinations about genuine disputes of fact are "blatantly contradicted by the record," *Scott v. Harris*, 550 U.S. 372, 380 (2007), but the exception does not apply here. A careful review of the dash-camera footage supports each of the district court's determinations about genuine disputes of fact. As discussed above, the dash-camera footage shows Dumond giving Meadows inconsistent instructions both to put his hands out the window and to open his door. In fact, the district judge even acknowledged that his own reaction to Dumond's command would have been to "reach down and pull [his] hand along the inside [of the car]." Sure, Meadows might have first tried to open his door from the outside. A reasonable jury could conclude, however, that Dumond knew that Meadows was complying or attempting to comply with Dumond's command to open the door when he tried to open his door from the inside of his vehicle, because people typically open a car door from the inside. Further, the dash-camera footage does not show Meadows flailing on the ground or otherwise positioning himself so that the officers could not arrest him. To the contrary, the footage shows Meadows's lower half lying completely still after the officers slammed Meadows to the ground. A reasonable jury could obviously conclude that the officers knew that Meadows was unable to roll over. The dash-camera footage therefore does not "blatantly contradict" the factual issues identified by the district court, and we may not review the district court's determinations about genuine disputes of fact.

To prevail on the excessive-force claim, Meadows must show that the officers' use of physical force amounted to a violation of Meadows's clearly established constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The officers' argument in this regard is based on their version of the facts, and not on the facts favorable to Meadows that the district court held that the jury could find. The officers in other words decline to argue that even if the jury found facts that do not amount to resistance, there was no clearly established constitutional violation. This is reasonably clear from the briefs, and was explicitly confirmed at oral argument:

> Judge: [If] the jury could find that there was compliance, that there was apparent compliance at all times, then you lose the appeal. Is that right?
>
> Counsel for appellant: I think that's right. I think that's right.

Oral Argument, 6:20–6:32. It follows that once we conclude, as we do, that the district court permissibly determined that a jury could find facts that, from the officers' perspective, showed no active resistance (as the term has been used by the courts), then that is the end of our analysis.

In any event, our precedent clearly establishes that taking Meadows to the ground, beating him, and fracturing his wrist when he did not actively resist arrest constitutes excessive force. It has been clearly established for several years in the Sixth Circuit that an officer cannot use injurious physical force to subdue a suspect that is not actively resisting arrest. *See Rudlaff*, 791 F.3d at 641–42. In *Coffey v. Carroll*, we stated flatly that "[a] suspect has a clearly established constitutional right to be free from the use of physical force by police officers when he is not resisting efforts to apprehend him." 933 F.3d 577, 589 (6th Cir. 2019) (citation omitted). In *Hagans v. Franklin Cnty. Sheriff's Off.*, we summarized cases from 2004 onwards where we have held force to be excessive from the use of a taser when "the suspects were compliant or had stopped resisting." 695 F.3d 505, 509 (6th Cir. 2012). We have repeatedly stated that "[d]rawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a claim pursued under § 1983." *Coffey*, 933 F.3d at 589 (citing *Hagans*, 695 F.3d at 509). Further, we have applied this clearly established constitutional right in the context of a traffic stop where the suspect was not actively resisting arrest. *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013).

In a recent case, we rejected qualified immunity in similar circumstances where the jury could have found that the defendant officer unnecessarily beat the plaintiff to effect an arrest, explaining that

> the Fourth Amendment prohibits officers from using "gratuitous" force that is unnecessary to effectuate the arrest of a person who has ceased resisting. *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006). In one case, for instance, an officer acted unreasonably when he allegedly hit an arrestee with a baton as the arrestee approached with hands raised. *Baker*, 471 F.3d at 607. In another, an officer acted unreasonably when he allegedly slammed a cooperating arrestee against a cupboard and tossed him down a small set of stairs. *Barton*, 949 F.3d at 952–54; *see also, e.g.*, *Malory v. Whiting*, 489 F. App'x 78, 84 (6th Cir. 2012) (beating); *Landis v. Baker*, 297 F. App'x 453, 461 (6th Cir. 2008) (ten baton strikes and four uses of taser); *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513–14 (6th Cir. 2006) (slap to face); *Phelps*, 286 F.3d at 297, 301–02 (beating); *McDowell*, 863 F.2d at 1307 (baton strike).

*Gambrel v. Knox County*, 25 F.4th 391, 403 (6th Cir. 2022). We further explained that the constitutional violation was sufficiently specific to be clearly established:

> [O]ur precedent had "clearly establish[ed] the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve*, 453 F.3d at 688; *see, e.g.*, *Phelps*, 286 F.3d at 301–02. Under the Supreme Court's framework, this legal rule is identified at a sufficiently "specific" level of generality to qualify as clearly established law in this case. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation omitted). For one thing, "the unlawfulness" of the Officers' alleged beating . . . would "follow immediately from the conclusion that [the rule] was firmly established." *Wesby*, 138 S. Ct. at 590 (citation omitted).

*Id.* Our caselaw therefore confirms that, based on the facts that a jury could find, Dumond violated Meadows's clearly established right to be free from the use of gratuitous force when Meadows was not actively resisting arrest.

The officers argue in response that their conduct falls in a "gray area" because they did not know whether Meadows was complying with their commands. The officers contend that, as a result, they are entitled to the benefit of the doubt and should receive qualified immunity. The argument appears to conflate ambiguity about the facts in this case for purposes of whether there is a genuine issue of material fact, on the one hand, with ambiguity from the officers' perspective about what the victim was up to, on the other. To be sure, when the facts confronting an officer

leave ambiguity about whether the officer's actions violate a constitutional right, the officer is entitled to qualified immunity. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam). But an officer is not entitled to qualified immunity when the facts are disputed, but a reasonable jury could find a set of facts that, if proven at trial, would show that an officer's actions violated a clearly established right. *See Wright v. City of Euclid*, 962 F.3d 852, 870 (6th Cir. 2020); *see also Gambrel*, 25F.4th at 404. In other words, in this case, if from the officers' perspective Meadows could be seen as possibly engaged in active resistance, then qualified immunity would presumably be warranted, and this would be true even if the officer was not entirely sure. But if the *jury* could reasonably conclude that from the officers' perspective Meadows could *not* be seen as possibly engaged in active resistance, then qualified immunity would not be warranted. The latter is clearly what the district court concluded, and that conclusion is supported by the dash-camera footage. On such facts, as discussed above, our precedent clearly establishes that an officer may not use injurious physical force to subdue a suspect that is not actively resisting arrest.

Finally, our decision in *Stanfield v. City of Lima*, 727 F. App'x 841, 848 (6th Cir. 2018), does not require a different result. *Stanfield* is an unpublished opinion that is not binding upon us. In any event, it is distinguishable. In that case, we held that three people injured in physical takedowns by the defendant officers *did* have their constitutional rights violated. *Id.* at 848–49. We nonetheless held that qualified immunity was warranted because the rights were not clearly established where the officers could perceive at least some resistance, *id.* at 850, or the struggle was in progress. *Id.* at 851. *Stanfield* is distinguishable on its facts, however, because there we concluded that Stanfield's actions "could reasonably have been perceived as resistance" by an officer. *Id.* at 848. And indeed Stanfield argued that his movements while intoxicated and off-balance "resulted in the movements the officers perceived as resistance." *Id.* at 844. Here, on the other hand, we must accept the district court's factual conclusion that a reasonable juror could conclude that no reasonable officer would perceive Meadows as resisting arrest or refusing to comply. *Stanfield* accordingly does not compel reversal in this case.

For the foregoing reasons, we affirm the district court's denial of qualified immunity for Officers Dumond and Wietfeldt.

_____

**DISSENT**

_____

NALBANDIAN, Circuit Judge, dissenting.  In excessive-force cases involving qualified immunity, our two-prong review is well-trodden ground.  As for the first prong—whether the officers violated Meadows's constitutional rights.  I think not.  The district court left some questions for the jury that it shouldn't have and made inferences in Meadows's favor despite clear video evidence.  For prong two, it's clear to me that no case provided notice to Officers Dumond and Wietfeldt that they used excessive force.

Because I would grant qualified immunity here, I respectfully dissent.

I.

When we evaluate whether officers violated a person's constitutional rights in an excessive-force case, we conduct a reasonableness inquiry.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  The objective reasonableness of the officer's conduct is a legal conclusion that courts decide.  *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).  To do so, we look at the totality of the circumstances.  *Graham*, 490 U.S. at 396; *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019).  Determining whether force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* (internal quotation marks omitted).  For its part, in *Graham*, the Supreme Court gave us a non-exhaustive set of circumstances to consider: the severity of the crime, whether a suspect poses a threat to officers or others, and whether a suspect is resisting arrest or fleeing should all be considered when operative.  *Id.*  Of course, police interactions are rarely the same, so the importance of these considerations (and others) will depend on the facts and circumstances of each case.  But no matter which considerations a court weighs, it must do so "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*

While *Graham* laid the foundation for the reasonableness inquiry, it stopped short of explaining whether judge or jury makes that determination.  *See* Michael L. Wells, *Scott v.*

Harris *and the Role of the Jury in Constitutional Litigation*, 29 Rev. Litig. 65, 74 (2009). True, the multi-factor totality-of-the-circumstances language resembles common-law negligence. And at common law, a jury generally evaluates whether a person's conduct meets the standard of reasonable care. *See id.* at 74–75. But in *Scott*, the Supreme Court clarified the inquiry in excessive-force cases involving a denial of qualified immunity. There, the district court denied qualified immunity because it found disputed material issues of fact, and the Eleventh Circuit affirmed. The Supreme Court reversed, and in doing so relied on video evidence that "blatantly contradicted" the version of the facts adopted by the Eleventh Circuit. *Id.* at 380.

But that's not all the Court did. After resolving that issue, the Court could have remanded the case for a jury to handle the reasonableness inquiry. It did not. Instead, given the video evidence and lack of dispute about the material, historical facts, the Court decided to "slosh [its] way through the factbound morass of 'reasonableness.'" *Id.* at 383. To do so, it balanced the intrusion on the individual (bumping the car of a fleeing suspect in a way that put him at serious risk of injury) with the governmental interests (protecting officers and the public from an imminent threat). In the end, the Court had "little difficulty" concluding that the use of force was reasonable given the suspect's relative culpability and the "actual and imminent" threat he posed to bystanders and the officers in pursuit. *Id.* at 384.

The majority's decision to proceed with the reasonableness inquiry didn't go unnoticed. Indeed, Justice Stevens in dissent argued that the jury should be the one to evaluate the officers' reasonableness. *See id.* at 390 (Stevens, J., dissenting). But the majority explicitly rejected that view, responding that "at the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*," the reasonableness inquiry is a "pure question of law." *Id.* at 381 n.8.

Thus, in *Scott*, the Supreme Court assessed reasonableness de novo by weighing the underlying considerations (balancing the use of force with the level of threat) de novo as well.[1]

---

[1]This treatment of excessive-force reasonableness under the Fourth Amendment is consistent with how we treat probable cause under the Fourth Amendment. *See Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020) (concluding that "the ultimate question of probable cause (*separate* from the determination of historical facts) in a civil case when the historical facts are undisputed is a question of law for the court and not a jury"); *see also Ornelas v. United States*, 517 U.S. 690, 696–97 (1996) (holding that application of the law to established facts for

Of course, it did so after determining the historical facts and drawing inferences in the nonmoving party's favor that the video evidence supported. This fact-finding and inference-drawing is the work of district courts, and, with a few limited exceptions, we don't disturb that work on appellate review. *See id.* at 378 (using video evidence when it "clearly contradicts" the facts adopted below); *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (using video evidence when it captures all of the material facts).

To be clear, all of this foundation is well-established and uncontroversial. *See Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) ("[O]bjective reasonableness is a legal conclusion reserved for this court."); *Stricker v. Township of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) ("If all material facts are undisputed, the reasonableness of officer conduct in an excessive-force claim is a question of law that a court may decide."); *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (considering the threat posed to officers de novo).

*Chappell* illustrates this point well. There, we didn't treat whether the plaintiff posed a threat to officers as a question of historical fact. Instead, we rejected the district court's denial of qualified immunity based on impermissible inferences drawn in the plaintiff's favor. 585 F.3d at 913. We then looked at the historical facts: the plaintiff was holding a knife, he was near the officers, and he moved quickly toward them. *Id.* at 910–12. Taking those facts, we decided that the plaintiff failed to meet her burden that officers used excessive force. *Id.* at 916. In sum, we began with the undisputed, material facts. We then allowed the district court to draw inferences in the plaintiff's favor only if supported by evidence, not a lack thereof. And then we balanced the threat posed by the plaintiff with the officers' use of force de novo.**[2]**

---

probable cause should be reviewed de novo). And like probable cause, reasonableness is a "constitutional term that defines the scope of a suspect's Fourth Amendment rights." *Gerics*, 974 F.3d at 804 (alterations omitted) (quoting Randall H. Warner, *All Mixed Up About Mixed Questions*, 7 J. App. Prac. & Process 101, 143–44 (2005)).

**[2]**True, at times we have used broad language that appears to conflict with this standard. Take *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020). We reversed some of the district court's grants of qualified immunity saying that "[t]he severity of the crime, whether Wright was a threat to the police, and whether Wright actively resisted arrest all present questions of fact that should be decided by a jury." *Id.* at 871. But it's clear that *Wright* had disputes of *historical fact*, like whether Wright moved his hands at all. *Id.* at 867. Those disputes are questions for a jury, and I read *Wright* to mean that we could not weigh the aforementioned considerations without the district court resolving those factual disputes. *Wright* established no new test. *See Browning v. Edmonson County*, 18 F.4th 516, 541 (6th Cir. 2021) (Murphy, J., dissenting in part).

Like the threat posed by a suspect, *Graham* also mentioned that courts should consider whether a suspect is resisting arrest. 495 U.S. at 396. So we also review that consideration de novo. *See Rudlaff*, 791 F.3d at 642 (granting qualified immunity after concluding that, based on the undisputed facts, the plaintiff was actively resisting arrest).

II.

Turning to the case before us, the district court denied qualified immunity for Officers Dumond and Wietfeldt because it found that a reasonable jury could conclude that Meadows was not actively resisting arrest. And if Meadows was not resisting arrest, the court continued, it was excessive force for the officers to take him to the ground. But whether Meadows was resisting arrest is not a question for the jury, but a mixed question that courts resolve and that we review as part of our reasonableness inquiry. And in reviewing the video, the level of Meadows's resistance is either active resistance or, at a minimum, in a grey area between active resistance and non-resistance. As a result, the officers' use of force was objectively reasonable. But even if it weren't, I don't think our caselaw provided enough notice to the officers that they used excessive force.

A.

At the outset, the district court got the standard half right:

> I think the question in all cases is objective reasonableness. . . . [W]hen we do have a videotape I think it helps us assess the objective reasonableness of what happened. . . . I think [the actual events] do create a genuine issue of fact that a jury could find the officers' response here was objectively not reasonable.

R. 93, PageID #679–80. The district court is correct that the standard is objective reasonableness, and that video evidence helps courts determine reasonableness. But unless the parties dispute historical facts, the court erred in believing that question is one for a jury. So let's examine the factual disputes the district court found.

For starters, the district court pointed to no *historical facts* that the parties dispute. Everything "in dispute" was an inference the district court made from clear video evidence about what a jury *could find*. But since this is an interlocutory appeal, the majority feels bound by the

district court's determination that a reasonable jury could conclude the officers didn't perceive Meadows as resisting arrest since "a defendant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (citation omitted).[3] That said, the majority recognizes that an exception exists (but doesn't apply here) when the district court's determinations are "blatantly contradicted by the record." *Scott*, 550 U.S. at 380. Putting that exception aside, we've recognized, regardless, that when video captures all the material facts, we review the facts as depicted by the video. *See Rudlaff*, 791 F.3d at 639. And as mentioned above, we have clear video evidence of what happened here. So even if the video doesn't "blatantly contradict" the district court's inferences, it does capture everything material and thus obviates any deference to the district court's inferences. Deferring to the district court's inferences is especially problematic when it comes to the level of Meadows's resistance because that's a determination that we make de novo. *See id.* at 642.

Take Officer Dumond's confusing instructions. The district court found that Meadows was "trying to be respectful, trying to comply, and [wa]s confused about how to do it." R. 93, PageID #682. But this conclusion is *based on the video*. True, asking Meadows to stick his hand out the window and then open his car door was not the clearest way to convey the instructions. But after Meadows put his hand back in the car for the first time and was admonished for it, Officer Dumond instructs Meadows to open the door from the outside and *not to put his hands back in the vehicle*. As seen from the video, Meadows violates that instruction. The district court inferred from that same video that Meadows was trying to comply and lamented: "What's the citizen to do?" *Id.*, PageID #657. In doing so, the district court contradicted *Graham*. Remember, the reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

---

[3]As Chief Judge Sutton has noted before, the scope of our review of district court inferences is, at best, in tension with the Supreme Court's decisions in *Scott* and *Plumhoff v. Rickard*, 572 U.S. 765 (2014). *See Barry v. O'Grady*, 895 F.3d 440, 445–46 (6th Cir. 2018) (Sutton, J., dissenting).

So what if the district court had considered Officer Dumond's perspective?  You have a suspect who committed a "moderate[ly] sever[e]" crime, R. 93, PageID #680, and who reached back into his vehicle after a clear instruction not to.  And while Meadows may have been confused, so too was Officer Dumond.  After all, Meadows told Officer Dumond his car was unlocked.  R. 67-1, Exh. A, 2:21–2:24.  With these facts, which were clear from the video, Officer Dumond's decision to take Meadows to the ground and end the stop as quickly as possible was reasonable.

Next, consider the struggle on the ground to get Meadows handcuffed.  Again, video of the dustup is available.  And again, the district court supposed a reasonable jury could find that Meadows was not actively resisting arrest.  In particular, the district court figured a reasonable jury could conclude that the struggle on the ground was not because of anything Meadows was doing.  Because he wasn't "punching back," the district court reasoned, a jury could find that the officers *knew* that Meadows was trying to comply.  But that inference doesn't come from the video, rather, it forces us to look into the minds of the officers.  Is such an inference reasonable and supported by the record?  *See Scott*, 550 U.S. at 381 n.8.  The majority seems to think so.  "A reasonable jury could *obviously* conclude that the officers *knew* that Meadows was unable to roll over."  Maj. Op. at 7 (emphasis added).  I don't share the majority's certainty.  How could I under *Graham*?  The only way to reach such a conclusion is to analyze the officers' conduct through the lens of hindsight, which *Graham* prohibits.  490 U.S. at 396–97.  What facts from the video, or even in the light most favorable to Meadows, could allow me to find that the officers *knew* Meadows could not roll over?

For instance, Meadows's lack of leg movement or flailing around doesn't speak to the issue of the officers' knowledge.  There's scant time for them to even consider the fact; the entire time from when Officer Dumond takes Meadows to the ground to when the officers get Meadows's arm out from under him takes less than thirty seconds.  R. 67-1, Exh. A, 3:01–3:27.  And when Meadows's arm is underneath his body, the officers are yelling at him to roll over and Meadows never says he's unable to do so.  This is exactly the kind of "rapidly evolving" situation contemplated in *Graham*, and the district court's inference here against the officers finds no support from the record.  *See Chappell*, 585 F.3d at 912 (declining to accept an

inference that the district court drew "not from the record evidence, but from a lack of evidence").

One last point. The district court noted that Meadows was not "punching back" or trying to conceal something under his body while the officers were trying to handcuff him. R. 93, PageID #683. True enough. But our caselaw doesn't require punching back to justify the force used here. *See Rudlaff*, 791 F.3d at 641–42. Instead, our caselaw confirms that, from the perspective of a reasonable officer on the scene, the officers used reasonable force taking Meadows to the ground and handcuffing him. *See id.* (collecting cases).

B.

Even if the officers' use of force were unreasonable, our caselaw did not provide the officers sufficient notice that their conduct was unlawful given the level of Meadows's resistance. The Supreme Court has clarified how we should review excessive-force claims brought under 42 U.S.C. § 1983. In order "to show a violation of clearly established law," a plaintiff "must identify a case that put [the officers] on notice that [their] specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam). The Supreme Court has emphasized that specificity matters in excessive-force cases, which often force courts to weigh the facts and circumstances of each case. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). That specificity starkly contrasts with the "high level of generality" of the standards the Court previously put forward in *Graham* and *Tennessee v. Garner*, 471 U.S. 1 (1985). *See Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam).

So which cases does Meadows point to? He cites *Rudlaff* for the general rule that "[w]hen a suspect actively resists arrest" police can use force; "but when a suspect does not resist, or has stopped resisting, they cannot." 791 F.3d at 642. At first blush, Meadows's proffered standard seems to be cast at the high level of generality the Supreme Court has cautioned against. What's more, this formulation puts the cart before the horse. Indeed, it's undisputed that Meadows didn't *fully* comply. The district court characterized his lack of compliance as "trying to comply" or "some kind of passive resistance." R. 93, PageID #682. At a minimum, that's more than not resisting at all.

In *Rudlaff*, we granted the officers qualified immunity because we held that the plaintiff was actively resisting arrest.  791 F.3d at 639.  The plaintiff swore at the officers and stared one of them down after voluntarily exiting his truck.  *Id.* at 640.  Then the plaintiff refused to put his hands on his truck and swung his arms away from the officers as they tried to handcuff him.  *Id.* After repeated attempts to handcuff the plaintiff, accompanied by verbal commands, an officer eventually tasered the plaintiff at which point the use of force ceased.  *Id.*  We held that the force was reasonable given the plaintiff's active resistance.

To begin, the resistance in *Rudlaff* is not of the "punching back" variety that the district court juxtaposed Meadows's behavior with.  To be sure, Meadows had a better attitude and gave the officers less difficulty when they tried to handcuff him.  But neither plaintiff, from the officer's perspective, complied with verbal commands.  And the use of force in *Rudlaff*, a taser, was more significant than a takedown.  We also said more about what qualifies as active resistance, such as "physically struggling with, threatening, *or disobeying officers*."  *Id.* at 641 (emphasis added) (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 496 (6th Cir. 2012)).  But other times we have called for "something more" than noncompliance to reach the level of active resistance.  *See Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (finding that a suspect's refusal to get out of his vehicle was not active resistance).  Of course, *Eldridge* is an unpublished decision which, as the majority notes, is "not binding upon us."  Maj. Op. at 10; *see also Shreve v. Franklin County*, 743 F.3d 126, 136 (6th Cir. 2014) ("*Eldridge* is an unpublished opinion that fails to provide any precedential guidance. . . . This court has therefore *not* recognized an important distinction between noncompliance and active resistance." (internal quotations omitted)); *Bell v. City of Southfield*, 37 F.4th 362, 367–68 (6th Cir. 2022) (recognizing that "a plaintiff cannot point to unpublished decisions to" show that a constitutional violation was "clearly established").

I also believe that *Coffey v. Carroll*, 933 F.3d 577 (6th Cir. 2019), is materially different than our case in a significant way: no video evidence was available.  Because Coffey disputed allegations that he kicked and bit the officers trying to arrest him, the district court had to view the facts in the light most favorable to Coffey.  *Id.* at 589.  So we were correct to say that Coffey

had a right to be free from the use of physical force under our caselaw.  But again, Meadows's case is different.  We have clear video evidence of, at a minimum, noncompliance.

Our recent opinion in *Gambrel v. Knox County*, 25 F.4th 391 (6th Cir. 2022), doesn't compel a different result either.  For one thing, *Gambrel* involved competing versions of events not captured on video.  *Id.* at 397, 403.  So when viewing the facts in the light most favorable to the non-movant, we were left with a version that had officers tasing a suspect many times and beating him repeatedly with a flash light and baton until he was nearly knocked out.  *Id.* at 403.  Using the version of the events favorable to the plaintiff, this was gratuitous violence on a suspect who posed no risk to the officers' safety and could have been easily handcuffed.  But this doesn't bear on our case.  The level of violence is much less here.  Yes, the officers delivered a few blows to Meadows's back to roll him over, but those strikes are far from "gratuitous."  *See id.* at 402–03 (collecting cases).  And the officers delivered those strikes because Meadows refused to roll over and so they couldn't handcuff him.  Once they got Meadows on his stomach, though, and they were able to handcuff him, the officers did so right away, without delivering any more blows.  So Meadows's case is different from *Gambrel*.

Finally, the majority distinguishes our decision in *Stanfield v. City of Lima*, 727 F. App'x 841 (6th Cir. 2018).  To begin with, *Stanfield* is an unpublished case that came out after Meadows's traffic stop.  So we can't rely on it to clearly establish that the officers' conduct here was unlawful when it occurred.  But *Stanfield* could help in determining what kind of conduct was *not* unlawful at the time of its publication, which is relevant here as Meadows's stop occurred just months before.

Three officers located Stanfield's RV after they received reports of him driving erratically.  727 F. App'x at 843.  Stanfield, who was intoxicated, reached an empty lot that he owned.  *Id.*  The officers approached his RV, and Stanfield exited the vehicle.  *Id.*  As the officers spoke to Stanfield, they instructed him not to put his hands in his pocket.  *Id.* at 843–44.  Moments later, Stanfield did just that, triggering one of the officers to grab his wrist and another to pat Stanfield down.  *Id.* at 844.  Stanfield struggled with the officers as they tried to control his arms.  *Id.*  During this struggle, one of the officers took Stanfield to the ground where the three

officers then wrestled Stanfield's hands behind his back. *Id.* Stanfield eventually sued, alleging that the officers used excessive force when taking him down.

A divided panel of our court affirmed the district court's grant of qualified immunity.[4] True, we held that the officers violated Stanfield's constitutional rights.[5] *Id.* at 848–49. Still, we granted qualified immunity because it was not "clearly established" that the officers' use of force was excessive given that Stanfield "could reasonably have been perceived to be resisting." *Id.* at 850. So *Stanfield* supports the officers' argument here. Around the same time as the events here, we held that it was not clearly established that similar conduct violated the plaintiff's constitutional rights. To reiterate, our published caselaw is clear that noncompliance (the situation with Meadows) is either active resistance, or at the very least in a grey area.

Even if Officers Dumond and Wietfeldt violated Meadows's constitutional rights (and I don't think they did), there is no case that clearly establishes the unlawfulness of the officers' specific conduct at the time of the traffic stop.

## III.

The district court erred in denying summary judgment to the officers. It left mixed questions for the jury to answer and drew inferences in Meadows's favor that found no support from the video. But above all, it did not find a case that would have provided notice to Officers Dumond and Wietfeldt that the force used to arrest Meadows was unlawful. For these reasons, I respectfully dissent.

---

[4]Even though the parties disputed some facts, we still considered the level of resistance ourselves without returning the case to the district court.

[5]But Judge Kethledge found that the officers' use of force was "as calibrated as it needed to be." *Stanfield*, 727 F. App'x at 852 (Kethledge, J., concurring in part).