NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0044n.06

No. 25-3481

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| REBECCA LUCAS, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jan 23, 2026 |
| | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| CITY OF REYNOLDSBURG, OHIO, et al., | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| Defendants, | ) | DISTRICT OF OHIO |
| | ) | |
| OFFICER NICHOLAS RUBENSTAHL, | ) | OPINION |
| Defendant-Appellant. | ) | |
| | ) | |

Before: GIBBONS, LARSEN, and MURPHY, Circuit Judges.

LARSEN, Circuit Judge. Rebecca Lucas sued Officer Nicholas Rubenstahl, claiming that Rubenstahl used excessive force while executing an arrest warrant. Rubenstahl moved for summary judgment, claiming qualified immunity. The district court denied the motion. Because Officer Rubenstahl is entitled to qualified immunity, we REVERSE.

I.

In 2022, a neighbor accused Rebecca Lucas of tampering with a "no trespassing" sign in her yard and filed a complaint against her. Based on the complaint, an arrest warrant issued for the misdemeanor offense of criminal mischief. Reynoldsburg Police Officer Nicholas Rubenstahl attempted to serve the warrant on Lucas, but he did not make contact with her when he went to her home.

The next day, a neighbor came to the police station and made another report about Lucas. The neighbor reported that a dispute had arisen over Lucas's "aggressive" dogs and that Lucas had "mooned" the neighbor. He also stated that Lucas had access to multiple firearms, which she brought outside and "racked" in the direction of her neighbors. That evening, Officers Rubenstahl and Ryan Martin went to Lucas's home to serve the original warrant and investigate the new complaint. Before approaching, Martin informed Rubenstahl that Lucas was known to possess firearms and had aggressive dogs. Bodycam footage shows their arrival and the ensuing encounter, although the winter evening lighting makes the footage rather dark.

Martin went up to the front door and knocked several times without receiving a response. He then moved to the side of the house to knock on a window. Meanwhile, Rubenstahl knocked on the front door, called out "Reynoldsburg Police Department," and stated that he wanted to talk to Lucas. Rubenstahl Bodycam, 19:30–20:06. The bodycam footage shows a sign on the door saying, "beware of dog"; next to the front door was a sign depicting a firearm and warning that guns were inside the house. More than one dog can be heard barking from inside the house throughout the recorded events.

Eventually, Rubenstahl called out that the officers would "get a warrant, come back, and kick down the door." *Id.* at 20:51–54. Soon after, Lucas opened the door. The video shows that the doorway blocked the view of Lucas's left hand while she stood in the opening. At that point, Rubenstahl said, "hi Rebecca?" *Id.* at 21:00–02. Almost immediately thereafter, Rubenstahl grabbed Lucas's right arm, saying "come on step out here with me." *Id.* at 21:01–05. As Rubenstahl grabbed her arm, Lucas asked "why?" *Id.* Rubenstahl responded, "you're under arrest." *Id.* As he said those words, the video shows Lucas tensing up and pulling slightly back,

while responding "for what." *Id.* at 21:05–08. A few seconds of scuffling sounds can then be heard.

All parties agree that Lucas held onto the doorframe in the encounter, although their reasons differ. The bodycam does not show Lucas holding onto the doorframe, but Lucas can be seen pulling away from the officers before the camera is obscured by movement. Lucas alleges that Rubenstahl and Martin performed a takedown maneuver to get her on the ground.[1] The video then shows Lucas lying on the ground as either Martin or Rubenstahl says, "I got her hands I got her hands." *Id.* at 21:17–19. The dogs can be heard now furiously barking in the background.

Lucas alleges that when Officer Rubenstahl handcuffed her, he pushed his knee hard into her lower back. The video shows that, at this point, the officers again told Lucas she was under arrest and asked if she was "okay" and if she "need[ed] a medic." *Id.* at 21:56–22:09. Lucas responded that she was not okay and needed a medic. Officer Rubenstahl then called a medic while Officer Martin examined Lucas for injuries. Ultimately, medics took Lucas to the emergency room. She suffered injuries to her shoulder, arm, and hip, some of which would later require multiple surgeries. Officers Rubenstahl and Martin followed Lucas to the hospital and served her arrest papers there.

Lucas sued Rubenstahl and Martin for, among other things, excessive force in violation of the Fourth Amendment. She moved for summary judgment on that claim. The officers responded with their own motion for summary judgment, raising qualified immunity as a defense. The district court resolved all claims in favor of the defendants except for the excessive force claim against

---

[1] Rubenstahl argues that the "momentum" from Lucas letting go of the door "took them to the ground" unintentionally, R. 30-1, Rubenstahl Dep., PageID 413–14, but we accept Lucas's version of the facts for purposes of this appeal. *Johnson* ex rel. *X.M. v. Mount Pleasant Pub. Schs.*, 155 F.4th 759, 765 (6th Cir. 2025).

Rubenstahl.[2]  Rubenstahl now appeals the denial of qualified immunity for the excessive force claim.

II.

We first consider our jurisdiction.  We have jurisdiction to decide an interlocutory appeal from a decision denying an officer qualified immunity to the extent the appeal "turns on an issue of law."  *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (citation omitted).  This appeal presents questions on "the meaning of the Fourth Amendment [and] the contours of clearly established Fourth Amendment principles."  *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025).  Those questions fall squarely within our jurisdiction.  *Id*.; *see also Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (holding that whether an officer's conduct violated clearly established Fourth Amendment principles is a "pure question of law").

To analyze the legal question, we rely primarily on "bodycam footage [that] accurately depicts . . . the relevant events."  *Heeter*, 99 F.4th at 910.  "[W]e may utilize that footage to 'ensure [that] the district court properly constructed the factual record' and assessed the legal questions in line with that record."  *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 601 (6th Cir. 2025) (second alteration in original) (quoting *Heeter*, 99 F.4th at 910).  To whatever extent the bodycam footage is unclear, we "resolve the legal issue" by accepting the plaintiff's record facts.  *Est. of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005); *Feagin*, 155 F.4th at 609.

---

[2] Lucas also sued the City of Reynoldsburg, but Lucas abandoned that claim at the summary judgment stage and the district court dismissed the claim without prejudice.  The court granted summary judgment to Martin on the excessive force claim and to Rubenstahl on a malicious prosecution claim.  Lucas does not appeal those decisions.

III.

We review de novo the district court's denial of summary judgment on qualified immunity grounds. *Heeter*, 99 F.4th at 908. Summary judgment is proper when, viewing the facts in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation modified). To overcome qualified immunity, "the plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). So, a plaintiff must show both that (1) the officer violated a constitutional right and (2) the right was clearly established. *al-Kidd*, 563 U.S. at 735. The officer receives qualified immunity if the plaintiff fails to prove either element. *Moore*, 126 F.4th at 1167.

For a right to be clearly established, a plaintiff must show that "reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). This sort of "fair notice" requires the plaintiff to point to "existing precedent" that "placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (citation modified). Generally, that requires the plaintiff to point to "closely analogous precedent with facts like the ones at issue here." *Feagin*, 155 F.4th at 603 (citation omitted); *see also Bell*, 37 F.4th at 367–68. And when, like here, the claim involves alleged excessive force, the specific facts are "especially important" because it is "difficult for an officer to determine how

the relevant legal doctrine" applies in new situations. *Rivas-Villegas*, 595 U.S. at 6 (citation omitted).

Lucas claims that Rubenstahl violated her Fourth Amendment right to be free from excessive force during an arrest or investigatory stop. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). But we need not decide whether a constitutional violation occurred because Lucas has not shown that her arrest violated clearly established law. In other words, Lucas has not shown that she had a clearly established right to be free from arm-pulling, a takedown, or a knee-to-the-back during the particular circumstances of her arrest.

Going step by step, we examine each use of force alongside "all of the events preceding." *Romero v. City of Lansing*, 159 F.4th 1002, 1009 (6th Cir. 2025) (citation omitted). And "we look comprehensively at 'any relevant events,'" not just the moment of force. *Feagin*, 155 F.4th at 609 (quoting *Barnes v. Felix*, 605 U.S. 73, 83 (2025)).

*Grab-and-pull*. Lucas has not shown that Rubenstahl violated any clearly established right when he pulled her onto the porch to effectuate her arrest. An officer may effectuate an arrest pursuant to a valid warrant when that person is standing in the doorway of her home. *United States v. Santana*, 427 U.S. 38, 42–43 (1976). Lucas has no constitutional right to be free from all physical contact with a police officer—her rights are only violated when allowable physical contact (like an arrest) becomes excessive force. And she has not pointed to any case with "facts like the ones at issue here" that would put an officer on notice that, in these circumstances, it would be excessive for him to pull a suspect onto the porch before further effectuating the arrest. *Feagin*, 155 F.4th at 603–04 (citation omitted). Here, Rubenstahl knew that Lucas had guns in her home, and he could hear dogs barking inside, making it safer to effectuate the arrest on the porch. The bodycam footage shows that the doorframe hid Lucas's left arm when she opened the door, and

Rubenstahl wouldn't have been able to see where the dogs were in the home. Lucas points to no case showing that an officer cannot move an arrestee out of an open door to remove a potential safety threat.

*Takedown.* Our cases establish that an officer may use a takedown maneuver or knee strike to restrain a resisting arrestee. *See Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *Rudlaff*, 791 F.3d at 642. But an officer may not use injurious physical force—like a taser, knee strike, or beating—to subdue an arrestee who is *not* actively resisting arrest. *Rudlaff*, 791 F.3d at 642; *Moore*, 126 F.4th at 1168. So, Lucas must show, in light of clearly established caselaw, that every reasonable officer at the scene should have known that a takedown and knee strike would amount to excessive force when presented with the facts at issue. She has not met that burden.

Active resistance can take many forms. "[K]icking, flailing, and wriggling away" all count. *Roell v. Hamilton County*, 870 F.3d 471, 482–83 (6th Cir. 2017). But active resistance can also be a "verbal showing of hostility," a "deliberate act of defiance using one's own body," or "some other mechanism" of resistance. *Browning v. Edmonson County*, 18 F.4th 516, 527 (6th Cir. 2021) (citation omitted). At the same time, our cases also hold that an officer cannot tase (or use other excessive force on) an arrestee if she presents no danger and "do[es] nothing to resist arrest[] or is already detained." *Id.* at 525–27 (describing past cases). Injurious force can also be excessive when a non-threatening individual resists arrest but does so only "passive[ly]," such as by merely failing to exit a vehicle. *Moore*, 126 F.4th at 1168.

In this case, Lucas has not shown that every reasonable officer should have concluded that she was not resisting. First, as already discussed, it was reasonable for Rubenstahl to bring Lucas onto the porch. The video shows that Lucas braced herself against this movement. "[P]hysical struggles with police" are a sign of active resistance. *Browning*, 18 F.4th at 527 (quoting *Thomas*

*v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017)). Lucas explains that she grabbed onto the doorway only to keep her balance. But Rubenstahl had no way of knowing that Lucas only meant to balance herself rather than prevent herself from exiting the home.

Second, there was reasonable suspicion that Lucas could be armed, *see id.* at 528–29 (noting the relevance of whether the officer had a "reasonable" or "objective basis" to believe the suspect was armed), or that her dogs would run to the door to protect their owner. An officer is entitled to use some force when an individual poses a physical threat to the arresting officer. *See Graham*, 490 U.S. at 396. And Rubenstahl could reasonably assume he needed to act quickly to remove Lucas from the open doorway.

Third, although Lucas is correct that we consider the severity of the suspected offense in the excessive force analysis, *Graham*, 490 U.S. at 396, an arrestee need not commit a felony before an officer can reasonably take into account developing dangerous circumstances. *See, e.g., Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 507, 511 (6th Cir. 2012) (finding that use of a taser on resisting suspect didn't violate clearly established law even when the plaintiff was "suspected of innocuous crimes, posed little risk of escape and had not yet physically harmed anybody"); *Caie v. W. Bloomfield Township*, 485 F. App'x 92, 96 (6th Cir. 2012) (noting that plaintiff "was not being arrested for a crime" before noting that "officer safety" could justify taser use).

Whether or not these factors would have justified Rubenstahl's use of a takedown and knee strike, no clearly established law shows that Rubenstahl's use of force was unreasonable. Lucas's actions fall well within the "zone of twilight" between active and passive resistance. *Feagin*, 155 F.4th at 604. And in such cases, officers are entitled to qualified immunity. *Id.*; *see also Rudlaff*, 791 F.3d at 644 (When "qualified immunity operates in the hazy border between excessive and

acceptable force," the "proper course is to grant summary judgment to the officers." (citation modified)); *Mills v. Cvitkovich*, 2025 WL 3043564, at *5 (6th Cir. Oct. 31, 2025).

*Knee strike*.  As for the alleged knee strike, such force is not excessive when the arrestee is still struggling with police.  *See Moore*, 126 F.4th at 1168; *Hagans*, 695 F.3d at 509.  The bodycam shows that the officers were still trying to secure Lucas's hands when she alleges that Rubenstahl kneed her forcefully in the back.  But once Lucas was handcuffed, the officers immediately stopped struggling with her and switched to asking whether she needed medical assistance.

Again, Lucas fails to put forward any cases with "facts like the ones at issue here" that clearly establish her right to be free from a takedown or knee strike.  *Feagin*, 155 F.4th at 603 (citation omitted).  It was Lucas's burden to come forward with caselaw clearly establishing the unconstitutionality of Rubenstahl's actions.  *See Stoudemire v. Mich. Dep't of Corrs.*, 705 F.3d 560, 568 (6th Cir. 2013) (explaining that, outside the obvious case, a plaintiff on summary judgment must show "failure to adhere to a particularized body of precedent that squarely governs the case here" (citation omitted)); *Moore*, 126 F.4th at 1167 (noting that a plaintiff usually "must identify a case with facts similar enough that it squarely governs this one, what amounts to on-point caselaw that would bind a panel of this court" (citation modified)).  The argument section of Lucas's brief merely recites the general contours of our qualified immunity analysis.  That's not enough.  And although Lucas lists several cases in her facts section, she makes no attempt to analogize those circumstances to the events here.

Our own review of the cases reveals that they could not have put Rubenstahl on notice that his actions violated clearly established law.  Lucas gestures first to *Coffey v. Carroll*, 933 F.3d 577, 589 (6th Cir. 2019) and *McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) to show that

Rubenstahl's "grab-and-pull" violated clearly established law. Appellee Br. at 17. In *Coffey*, a plaintiff testified that police officers entered his home, "awoke him by punching him in the face," and then used his head as a battering ram to open a storm door. 933 F.3d at 589. Lucas does not even attempt to show how those facts are analogous to the ones at issue here. Unlike the officers in *Coffey*, Rubenstahl sought to effectuate a legal arrest pursuant to a warrant and did not enter Lucas's home to do so. Rather, he told Lucas she was under arrest and pulled her toward the porch where he would be able to better assess the location of firearms and barking dogs. Nothing in *Coffey* would show a reasonable officer that Rubenstahl's original grab-and-pull motion violated Lucas's right to be free from excessive force.

As for *McCaig*, unpublished caselaw can't clearly establish a constitutional right. *Bell*, 37 F.4th at 368. But even if *McCaig* were applicable, it wouldn't suffice to put Rubenstahl on notice. In *McCaig*, the court had no video footage and accepted the plaintiff's view of the facts. 515 F. App'x at 555. Under that view, the plaintiff "rais[ed] his hands over his head in a 'surrender motion' and then [held] out his hands to be handcuffed," saying "I'll go easily." *Id.* at 553. In response, the officer yelled "so loudly that it hurt [the plaintiff's] ear," causing him to "jerk[] away." *Id.* The officer then "slamm[ed]" the plaintiff into the ground, breaking his arm in the fall, and remained on top of the plaintiff for "ten to thirty seconds." *Id.* Here, Lucas did not surrender and instead held onto the doorframe of her home when Rubenstahl sought to bring her onto the porch and away from a safety threat.

Lucas then mentions *Meadows v. City of Walker*, 46 F.4th 416, 422 (6th Cir. 2022). There, the plaintiff had been subject to a traffic stop. The plaintiff tried to open his car door at the officer's command but couldn't. *Id.* at 418. When he finally exited the vehicle, the officer "slammed him to the ground" and then "kneed" him while another officer punched him multiple times. *Id.* The

court noted that the plaintiff was "compliant, polite, [and] respectful" from the beginning of the engagement. *Id.* at 420. So while Lucas is correct that an "officer cannot use injurious physical force to subdue a suspect that is not actively resisting arrest." Appellee Br. at 18 (citation omitted), *Meadows* doesn't show why Lucas should fit in that category. Instead, *Meadows* confirms that "[w]hen a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him." 46 F.4th at 420 (citation omitted). Lucas points to no facts that would have put Rubenstahl on notice that her actions did not constitute active resistance.

Lucas's references to *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) and *Moser v. Etowah Police Department*, 27 F.4th 1148, 1153 (6th Cir. 2022) are equally ineffective in clearly establishing that Rubenstahl's alleged knee to her back was excessive. In *Champion*, we said that officers violated a plaintiff's constitutional rights when they put pressure on the plaintiff's back and "[c]reate[d] asphyxiating conditions" after he was already subdued by the officers, resulting in the plaintiff's death. 380 F.3d at 903. And in *Moser*, we said that an aggressive knee to a plaintiff's back was excessive force when an officer took a non-arrestee plaintiff to the ground in response to her merely touching another officer's arm and saying that he had the wrong man. 27 F.4th at 1150–51. Here, the officers were actively trying to handcuff Lucas when she alleges that Rubenstahl kneed her in the back. And as soon as she was successfully handcuffed, all use of force ended. As before, "police can use a taser (or a knee strike) to subdue" a resisting arrestee. *Meadows*, 46 F.4th at 420 (citation omitted). Lucas needed to provide a case showing that any reasonable officer would have known that her actions did not amount to active resistance. She has not done so here.

On the record before us, no clearly established Fourth Amendment violation occurred.

* * *

We REVERSE the district court's order denying qualified immunity.